**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Newport News Division**

| | |
|---|---|
| MANIMEGALAI LOGANATHAN, ) | |
| ) | |
| *Plaintiff*, ) | |
| ) | |
| v. ) | Civil Action No. 4:25-cv-120 |
| ) | |
| FERGUSON ENTERPRISES LLC, ) | |
| ) | |
| *Defendant*. ) | |
| ) | |

**DEFENDANT FERGUSON ENTERPRISES, LLC'S MEMORANDUM OF LAW IN
SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

Defendant Ferguson Enterprises, LLC ("Ferguson") submits this Memorandum of Law in support of its Motion for Summary Judgment on all claims brought by Plaintiff Manimegalai Loganathan ("Loganathan").

## I.     __INTRODUCTION__

Loganathan was terminated from her position as a Software Engineering Manager at Ferguson after she failed to improve her performance during a performance improvement plan ("PIP").  Although she performed effectively in an individual contributor role on Ferguson's software engineering team, she struggled when she was promoted to a manager role and lacked many of the skills necessary to effectively manage employees.  Perhaps recognizing that she was struggling in her role, on September 6, 2024, Loganathan contacted her supervisor, Rajat Nair ("Nair"), himself an immigrant from India, to request a transfer to a different position.  She ultimately did not transfer to a new position, and after her performance became more closely managed and she sensed less availability from Nair, she claimed that she was being "retaliated" against for inquiring into a new role.  However, she did not claim retaliation or discrimination based on her race, national origin, or other protected classification or activity.  Loganathan was placed on a PIP on November 21, 2024.  Loganathan was terminated on February 11, 2025, because she failed to incorporate constructive feedback and improve her performance during the PIP period.  Notably, without informing Ferguson, Loganathan had accepted a position with a new employer two weeks before her termination.

Loganathan filed a Charge of Discrimination with the United States Equal Employment Opportunity Commission ("EEOC") on March 19, 2025. Her Charge could not timely be based on events allegedly occurring before May 23, 2024. Her Charge claimed national origin discrimination and retaliation, but made no mention of race discrimination.  Nor was race

discrimination raised at any point during the EEOC's investigation of Loganathan's Charge. As a matter of law, she failed to exhaust any claim based on race discrimination.

From the outset of this action, Loganathan's claim that she was discriminated against has been premised "[u]pon information and belief." *See* Compl., Dkt. No. 1 ¶ 2; Am. Compl., Dkt. No. 18 ¶ 2. With discovery closed, after the Court granted Ferguson's Motion to Compel responses to document requests and interrogatories about core aspects of Loganathan's claims, the record still lacks any evidence of discrimination or retaliation on the basis of protected activity. Summary judgment should be granted in favor of Ferguson on Plaintiff's claims under Title VII and the Virginia Human Rights Act, and this case should be dismissed.

## II.    STATEMENT OF UNDISPUTED FACTS[1]

### A.    Background on Parties.

1.    Ferguson is the largest distributor of plumbing supplies, pipes, valves, fittings, waterworks, and fire and fabrication products in the United States. **Ex. 1**, Declaration of Rajat Nair ("Nair Decl.") ¶ 7.

2.    Ferguson maintains an EEO and Harassment Prevention Policy that prohibits discrimination because of any protected characteristic, including race and national origin, and prohibits retaliation based on legally protected activity. **Ex. 2**.

3.    Ferguson hired Loganathan on July 2, 2018, as an IT QA Analyst III assigned to its headquarters in Newport News, VA. **Ex. 3** at FERGUSON-0000029. She later moved to a Business Systems Analyst position. Nair Decl. ¶ 8. Loganathan worked on Ferguson's backend engineering team, supporting Ferguson's software delivery lifecycle. Nair Decl. ¶ 8.

---

[1]    This Statement of Undisputed Facts ("SOF") is submitted pursuant to Federal Rule of Civil Procedure 56(c) and Local Civil Rule 56(b).

4.      Loganathan is an immigrant from India, who initially worked for Ferguson on an F-1 student visa. *See* Nair Decl. ¶ 9; **Ex. 4** at 65:24–66:6, 133:25–134:5. Ferguson then sponsored her H-1B visa application and assisted her in the process of applying for permanent residency and Permanent Labor Certification with the United States Department of Labor.   Nair Decl. ¶ 9.

5.      As an individual contributor between July 2018 and November 2023, Loganathan was an effective performer and received "Effective" or "Highly Effective" performance reviews in her annual reviews, which respectively equate to a three or a four on Ferguson's five-point employee rating scale. **Ex. 3** at FERGUSON-0000060; Nair Decl. ¶ 11.

**B.      Loganathan's Promotion to Managerial Role and Performance Issues.**

6.      On December 1, 2023, Plaintiff was promoted to the role of Manager – Software Engineering, in which she was assigned to supervise multiple teams supporting Ferguson's shared services software.  Nair Decl. ¶ 12; **Ex. 3** at FERGUSON-0000029.

7.      Loganathan struggled from the outset with her managerial role in her new position. In Loganathan's February 2024 Midyear Performance Checkpoint evaluation, Nair noted that Loganathan has been "immersed in learning about the new teams and engaging with business stakeholders" and "has focused on familiarizing herself with the expanded scope of responsibilities and building relationships with key stakeholders," but noted that she needed to work on "Relationship Building," "Communication Skills and Emotional Intelligence," and a "Skillset Ramp-Up" to become "a proficient technical manager." **Ex. 5**.

8.      Beginning in June 2024, in connection with her then-forthcoming annual evaluation, Ferguson solicited feedback from her colleagues, including peers, supervisors, and direct reports, on Loganathan's performance in her new role.  Nair Decl. ¶ 13; **Ex. 6**. One Ferguson associate submitted feedback on Loganathan unprompted.  Nair Decl. ¶ 13.

9.      Loganathan received some positive feedback, but also received extensive constructive criticism, including the following:

- "Mani should take into consideration that some of her team members have experience in their respective areas that she does not. Because of that, she should trust their recommendations and not attempt to assert herself when she doesn't have the same knowledge/skill set to support decisions and directions. Being kept informed is one thing, trying to steer the (wrong) direction is another. Mani should also evaluate the role and duties/responsibilities of those reporting to her. All roles cannot be managed the same. Some roles are self-managing and too much involvement begins to feel like micromanagement."  Linda Ware, June 13, 2024.

- ". . . Mani should consider taking more initiative to seek out opportunities to lean in on our current challenges/opportunities. I would like to see Mani be more proactive when we have issues, and be more aware of the work in the space, the issues her team is working on, and what is happening to resolve them."  Stephanie Goldberg, June 24, 2024.

- "Mani tends to interrupt people when on calls but has improved on this recently. On calls she sometimes doesn't understand the issue at hand and tries to solution on a meeting that is an update meeting. She also has had some issues with my BSAs it seems to spawn from one thing they don't do that initiates a discussion with Rajat and not myself. I think she is still finding her way as a manager and jumps to conclusions about work and people. She also doesn't follow the hierarchy in our group. Prior to reaching out to my team or Rajat she should reach out to me and give me a chance to fix the situation if it needs fixing. I've found there isn't a big enough issue for some of the issues that have been brought up." Michelle Hicks, July 3, 2024.

- "If there is an issue Mani is quick to point the finger at someone instead of trying to help find a solution. When the teams are quickly trying to resolve an issue with another team and need to loop in L3 or request their assistance she will start questioning why we didn't notify them in advance and follow the correct process. Sometimes if there is a high priority issue we need to act quickly and do not always have advance notice. This makes our team look bad in front of other teams and its embarrassing to the teams working to resolve the issue. Being flexible goes a long way. Instead of trying to help resolve an issue she is quick to say that that is not her role it is a BSA, PO or Team Lead role. When its an issue we should all try to pitch in to get it resolved no matter what role you are in. Time is lost when we wait for others to resolve something that we have the knowledge to help resolve ourselves." Dianne Diggs, September 26, 2024.

**Ex. 6**.

10.      Other Ferguson colleagues and vendors submitted additional feedback in fall 2024 and raised concerns about Loganathan's management and performance, including repeated

interruptions during meetings, dismissive communications, and unconstructive remarks that negatively impacted team morale. *See* **Ex.** 7.

11. Managers noted that Loganathan was not receptive to this negative feedback, and these managers indicated that rather than accepting the feedback as an opportunity to improve, Loganathan would often push back on or fail to incorporate the feedback. *See* **Ex. 8**; **Ex. 9** (A. Lautenslager feedback); Nair Decl. ¶ 15.

**C.      Loganathan's Compensation in Her Manager Role.**

12. Upon her promotion on December 1, 2023, Loganathan's monthly salary increased from $8,027.91 to $8,830.62. **Ex. 3** at FERGUSON-0000037–38.

13. This was within the salary range for her position of $7,568.91–$13,247.76. *Id.* at FERGUSON-0000037.

14. She also became eligible for a bonus plan with a target 15% annual bonus. *Id.* at FERGUSON-0000038.

15. When Loganathan initially accepted the position, she wrote that she was "thrilled" to accept it but was concerned with the fact that the compensation "appears to align with the lower end of the salary range mentioned in the job description." **Ex. 10**. She asked if Ferguson could "revisit and assess my performance after six months with the potential for a salary increase." *Id.*

16. Loganathan later claimed to the EEOC and in this lawsuit that Nair told her during this time that she would "not be getting the same pay as American workers because you are an Indian and on a visa." **Ex. 11** at Supp. Resps. to Inter. Nos. 2. However, Loganathan has no contemporaneous documentation of this alleged statement, and it was not mentioned in her human resources complaint or the subsequent investigation, nor in the demand letter her attorney sent to Ferguson's legal department in January 2025. *See* **Ex. 12**; **Ex. 13**.

5

17. Just over a month after receiving the promotion, Loganathan complained that her take home pay after taxes was lower than she expected. **Ex. 14**.

18. Her wages during this time reflected that for a period of time after her visa transition, Ferguson had erroneously not been deducting certain taxes from her salary, such that her prior take home pay did not reflect the full required tax deductions. *See id.*

19. Ferguson fixed this issue once discovered but did not require Loganathan to refund any overpayment. Nair Decl. ¶ 22.

20. Nair inquired into whether Loganathan's salary could be further increased to address this issue, but second level supervisor Harrison Rogers confirmed that Ferguson does not "true[] up [employees' salaries] to offset the taxes [employees] owe." He noted, though, that Loganathan's compensation could continue to grow commensurate with her skillset and contributions. **Ex. 14**.

21. In July 2024, Loganathan complained that an external hire who lived in another region was offered a higher salary to perform a managerial function. *See* **Ex. 4** at 156:24–161:3.

22. The identified associate was an external hire, had more extensive professional and management experience than Loganathan, held a platform and infrastructure role (rather than the development role Loganathan held), and was in a different geographical market. Nair Decl. ¶ 24.

23. In October 2024, Ferguson awarded Loganathan a 17.6% base salary increase, raising her monthly salary to $10,422.24, which was above the median salary for her position. *See* **Ex. 15**; **Ex. 3** at FERGUSON-0000037–38.

**D.        Loganathan Requests Permission to Pursue Other Internal Positions.**

24.     On or around September 6, 2024, Loganathan contacted Nair seeking permission to apply for an internal Ferguson position with a different group.  **Ex. 16**;  Nair Decl. ¶ 17.[2]

25.     Before this point, Loganathan stated she "wanted to move" to a different position because she "felt [she did not] have transparency" and "found it difficult to manage [her] team." **Ex. 12** at FERGUSON0000484.

26.     Later that day Loganathan sent a message to Nair asking "[s]hall I start exploring internal openings." He responded "Yep" and "[y]ou have my manager approval to proceed." **Ex. 16**.

27.     In her contemporaneous documentation of events, Loganathan expressed concern about Nair's "declining availability on September 6th" and "assumed he might be unhappy with my decision to explore other opportunities . . . ." **Ex. 17**. *See also* **Ex. 4** at 204:6–205:3.

28.     On the afternoon of September 6, 2024, Nair took his family pet to the vet, **Ex. 16**.

29.     The next day (a Saturday), Loganathan "let [Nair] know that I would drop my plans to look elsewhere and continue in my current role." **Ex. 17**.

30.     On October 28, 2024, Loganathan contacted Nair's supervisor, Harrison Rogers, to schedule a call to discuss "some challenges and work" and to get his "guidance to navigate these challenging times." **Ex. 18**.

31.     According to Loganathan, three days later she informed Rogers that "after [she] expressed [sic] in applying for internal roles on 09/06, I have noticed significant changes in Rajat's availability and communication, as well as some intimidating behavior, accompanied by a reduction in my responsibilities," that such instances have "created considerable mental pressure,"

---

[2]     At Ferguson, associates applying for internal opportunities are required to indicate in the application whether the associate's current manager approves of the transfer.  Nair Decl. ¶ 16.

and that she was concerned that "considering these circumstances, this situation may be perceived as retaliation or harassment." *Id.* at P119. Loganathan did not attribute Nair's conduct to her race, national origin, or any other protected classification or activity. *See id.*; **Ex. 12**; **Ex. 4** at 177:11–179:7, 234:15–25.

32. In an October 31, 2024 meeting with Rogers and Nair, Loganathan claimed she "felt retaliation and work place harassment." Thereafter, Rogers escalated these concerns to Ferguson's human resources department. **Ex. 17**. Once again, Loganathan did not attribute this "retaliation" and "harassment" to her race, national origin, or other classification or engagement in activity protected by Title VII or the VHRA. *See id.*; **Ex. 12**; Nair Decl. ¶ 21.

**E.    After Numerous Documented Performance Deficiencies, Loganathan was Placed on a PIP.**

33. In Plaintiff's 2024 annual review, issued by Nair on October 2, 2024, Loganathan received an "Effective Performance" rating, a three on a five-point scale. **Ex. 19**.

34. However, this review also included extensive constructive feedback, and stated that she needed to continue to focus on the "Relationship Building," "Communication Skills," and "Skillset Ramp-Up," areas for improvement noted eight months earlier in her mid-year checkpoint evaluation. *Id.*; *see* **Ex. 5**.

35. The 2024 review incorporated feedback from Loganathan's colleagues. Nair Decl. ¶ 18.

36. The review stated that Loganathan needed to work on the following areas:

- "**Building Trust with Associates**: With the recent reorganization and being relatively new to the role, it's important for Mani to build foundational trust with peers and direct reports. Establishing strong relationships and fostering a culture where healthy conflict is welcomed will be crucial for the year ahead."
- "**Embracing Continuous Learning**: Learning is an ongoing process. Building relationships with team members who excel in their areas and relying on their expertise while learning alongside them will be key to her development."

8

- "**Fostering Team Autonomy**: Aim to make the teams more autonomous, enabling them to execute efficiently and effectively on business outcomes with clearly defined SDLC goals."
- "**Ongoing Learning and Influential Leadership**: Continue to expand your perspectives through reading and growth. Mastering the art of influence is essential. Leadership should be based on respect and influence rather than just title, and developing these skills will enhance your ability to lead effectively."

**Ex. 19**.

37.    On October 29, 2024, Nair explained that Loganathan's review "attempted to address what she should do different based on the feedback received, with the aim being positivity and encouragement to change." He noted, though, that "as days and weeks go by things are deteriorating."  **Ex. 8**.  Nair expressed concerns about Loganathan's performance as a manager, including that "[t]he team feels alienated and targeted by her," that "she was in ways abusing her role as a manager," and that he and others experienced that she was not properly making changes based on coaching and feedback.  *Id.*  Nair noted that the previous day—October 28, 2024—he spoke with Michelle Hicks about a potential PIP and expressed that he believed Loganathan "is the wrong person for any role in Ferguson . . . ." *Id.*

38.    Additional feedback on Loganathan was later received from others; it described issues such as "[r]epeated instances of interruption during discussions, often due to lack of clear understanding of the topic," communication issues, difficulty accepting constructive feedback, and inadequate understanding of technical requirements and approaches.  *See* **Ex. 20**; **Ex. 9**.

39.    In connection with an organizational restructuring, Michelle Hicks became Loganathan's manager on November 1, 2024.  **Ex. 3** at FERGUSON-0000029; Nair Decl. ¶ 26.

40.    On November 5, 2024, Hicks and Loganathan met and discussed, among other topics, "feedback from multiple people from our group as well as outside of our group" and Hicks's

9

desire to "create a plan that will provide you success towards where you need to be." **Ex. 21** at P71.

41. Loganathan confirmed that she was "good with the details" in Hicks's email. *Id.* at P. 70. On November 14, 2024, Loganathan was informed that she would be placed on a PIP. **Ex. 22** at P50.

42. Loganathan was placed on a PIP on November 21, 2024. The PIP highlighted the feedback she received and identified three areas for improvement: "Conduct/Teamwork," "Situational Awareness," and "Productivity." **Ex. 23**.

**F.    Loganathan Complains About Retaliation Based on Her Transfer Request.**

43. Shortly after the decision was made to pursue a PIP, **Ex. 8**, and following the October 31, 2024 meeting between Loganathan, Nair, and Rogers, a human resources case was opened after Loganathan expressed that she felt like she was being harassed and retaliated against based on her outreach to Nair. *See* **Ex. 12**.

44. Then, on November 12, 2024, Loganathan sent a lengthy email to Rogers in which she expressed concerns about Nair's "accountability, autonomy, and transparency, along with actions that seemed to undermine my leadership," expressed an interest in moving to a new role, and summarized her contributions in her managerial role. **Ex. 24**. Her email also mentioned potential "retaliation or harassment," but again her email included no claim that her treatment was based on race, national origin, or other protected classification or engagement in legally protected activity. *Id.* at Ferguson0000472.

45. On or about November 13, 2024, Loganathan submitted an "Associate Workplace or EEO Concerns" request through Ferguson's Human Resources portal, wherein she again explained that she "ha[d] been feeling micromanaged" and experienced stress after expressing interest in exploring new roles on September 6. *See* **Ex. 25**; **Ex. 26**.

46. HR's investigation, which included interviews and input from Loganathan, concluded there was no evidence to substantiate Loganathan's claims. **Ex. 12**.

47. The investigation report reflects no complaint based on or evidence of differential treatment on the basis of race or national origin. *See id.*

48. In response to the PIP, Plaintiff commented that "I strongly believe that this action may be retaliatory in nature." **Ex. 23**. The asserted basis was that "[p]rior to being placed on the PIP, I was not informed of any performance issues, either orally or in writing, which is inconsistent with the general Ferguson PIP policy followed for other employees." *Id.*

**G.      Loganathan is Terminated.**

49. In or around December 2024, Plaintiff requested a transfer to an individual contributor position, but no openings existed at the time. **Ex. 27** at P101–102; Nair Decl. ¶ 27.

50. After more than two months on the PIP, Ferguson saw insufficient improvement on the documented performance issues and encountered Loganathan's continued resistance to accept feedback about her performance. Ferguson therefore terminated her employment on February 11, 2025. Nair Decl. ¶ 28.

51. In December 2024, while the PIP was in its early stages, Loganathan applied for a position with HTC Global Services. **Ex. 4** at Tr. 78:2–14. Two weeks before her termination, on January 29, 2025, Loganathan accepted a job with HTC Global Services, for which she was offered a $130,000 annualized base salary, plus benefits. **Ex. 28**. This exceeded her $125,066.88 annualized base salary at Ferguson at the time of her termination. *See* **Ex. 15**. Loganathan's start date was set for February 24, 2025.

**H.      Jeanine Wandera and Will Parks Were Differently Situated Than Plaintiff.**

52. In her Amended Complaint, Plaintiff claims that "[u]nlike her colleagues, Will Park[s] and Jeanine Wandera, were given verbal and written warnings and allowed time to

11

improve, despite ongoing performance issues.  In contrast, Plaintiff was immediately placed on a PIP with no prior warning."  Am. Compl., Dkt. No. 18 ¶ 24.

53.     The record, however, shows that Loganathan **did** receive performance feedback before she was placed on a PIP.  *See* SOF ¶¶ 7, 9–11, 33–38, 40–41.

54.     In discovery, Loganathan identified almost no facts supporting this claim, other than her assertions that: (1) for Parks, Nair recommended "a constructive conversation" and ensuring Parks followed feedback, and (2) Wandera received multiple oral warnings before being placed on a PIP.  **Ex. 11** at Supp. Resp. to Inter. No. 22.

55.     Loganathan acknowledges that like her, Wandera was placed on a PIP.  *Id.*[3]

56.     Unlike Loganathan, both individuals were performing in individual contributor roles, rather than managerial roles. Neither exhibited performance concerns around personnel management.  Nair Decl. ¶ 29.

57.     Instead, each exhibited performance concerns associated with technical performance aspects of their software development roles.  Nair Decl. ¶ 29.

58.     Further, both Parks and Wandera were receptive to and attempted to incorporate performance feedback.  Nair Decl. ¶ 30.

59.     Loganathan claims that Ferguson violated its supposed "PIP Policy," referring to a "Quick How to Guide," which provides that "[g]eneral practice would be to begin with a verbal discussion or performance review then move to PIP if the associate fails to improve within a reasonable amount of time."  *See* **Ex. 29** at P79–81.

---

[3]     Wandera was placed on a PIP and separated from employment during the PIP period.  Nair Decl. ¶ 31.

60.    Loganathan does not identify any Ferguson policy that mandates verbal counseling or otherwise restricts Ferguson's discretion with regard to PIPs. *See id.* (relying on "[g]eneral practice" included in an internal "Quick How To Guide").

61.    Through its policies, Ferguson retains discretion to address performance issues, including with or without progressive discipline. *See* **Ex. 30** (Ferguson policy stating "the company need not resort to progressive discipline, but may take whatever action it deems necessary to address the issue at hand"). *See also* **Ex. 23** at FERGUSON-0000282–83 (Loganathan acknowledges that "I understand that progressive discipline is not required and the timeline above does not guarantee employment . . . .").

## III.    <u>ARGUMENT</u>

### A.    Summary Judgment Standard

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  Summary judgment must be granted if Loganathan fails to make a showing sufficient to establish an essential element of her case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).  "Mere unsupported speculation is not sufficient to defeat a summary judgment motion . . . ." *Francis v. Booz Allen & Hamilton, Inc.*, 452 F.3d 299, 308 (4th Cir. 2006); *see also Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 148 (2000) (explaining that "trial courts should not treat discrimination differently from other ultimate questions of fact").

### B.    Loganathan Failed to Exhaust her Administrative Remedies for Discrimination and Retaliation Claims Based on Race.

When individuals allege violations of Title VII (or the VHRA), they must first file an administrative charge with the EEOC and exhaust administrative remedies before filing a lawsuit in federal court. *See Balas v. Huntington Ingalls Indus., Inc.*, 711 F.3d 401, 406–07 (4th Cir. 2013);

13

*Jones v. Calvert Grp., Ltd.*, 551 F.3d 297, 300 (4th Cir. 2009); *Chacko v. Patuxent Inst.*, 429 F.3d 505, 509 (4th Cir. 2005); *Hoffman v. Inova Health Care Servs.*, 169 F.4th 207, 218 (4th Cir. 2026). A federal court may only consider allegations included in the EEOC charge. *Balas*, 711 F.3d at 407; *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 962–63 (4th Cir. 1996); *see also King v. Seaboard Coast Line R. Co.*, 538 F.2d 581, 583 (4th Cir. 1976) ("The suit filed may encompass only the discrimination stated in the charge itself or developed in the course of a reasonable investigation of that charge." (internal quotes omitted)).   Thus, any claim asserted in a civil complaint will "typically be barred if the administrative charge alleges one type of discrimination . . . and the claim encompasses another." *Walton v. Harker*, 33 F.4th 165, 172 (4th Cir. 2022); *see also Balas*, 711 F.3d at 407; *Lawson v. Burlington Indus., Inc.,* 683 F.2d 862, 863–64 (4th Cir. 1982); *Bryant v. Bell Atl. Maryland, Inc.*, 288 F.3d 124 (4th Cir. 2002) (holding a claim for color discrimination was not administratively exhausted by an EEOC Charge alleging race discrimination).

In her Charge, Loganathan only alleged discrimination based on her "national origin (Indian) and visa status"—there was no mention of race discrimination. **Ex. 31**. Crucially, these claims are different; they rely on investigation of different factual predicates. The EEOC explains that national origin discrimination involves treating employees differently "because they are from a particular country or part of the world, because of ethnicity or accent, or because they appear to be of a certain ethnic background (even if they are not)," while race discrimination involves treating someone unfavorably because the employee is "of a certain race or because of personal characteristics associated with race (such as hair texture, skin color, or certain facial features)."[4]

---

[4]    *Contrast* https://www.eeoc.gov/national-origin-discrimination *with* https://www.eeoc.gov/racecolor-discrimination.

14

Judges within this District have observed that "race, national origin, and religion are ideologically distinct." *Abdelhamid v. Summit Ridge Energy, LLC*, No. 1:24-CV-1553, 2025 WL 2771670, at *3 (E.D. Va. Sept. 29, 2025) (quoting *Sarraj v. N. Virginia Elec., Coop.*, No. 1:22-CV-12, 2022 WL 2820553, at *6 (E.D. Va. July 18, 2022)). As the factual allegations of the Charge provide no indication that the allegedly discriminatory behavior was based on race or its associated characteristics, the relationship between the facts in the Charge and the Complaint are not reasonably related. *See Chacko*, 429 F.3d at 509–10. "[I]t would not be proper for the Court to re-cast the plaintiff's national origin discrimination claim as a race discrimination claim." *Kun v. Finnegan, Henderson, Farabow, Garrett & Dunner*, 949 F. Supp. 13, 19 (D.D.C. 1996) (dismissing a claim for national origin discrimination claim where only racial discrimination was alleged in the EEOC charge); *see also Ang v. Procter & Gamble Co.*, 932 F.2d 540, 545–46 (6th Cir. 1991) (affirming dismissal of a claim for race discrimination where only national origin discrimination was alleged in the EEOC Charge). As Loganathan's Charge alleged no facts indicating that anything other than her national origin (Indian) or visa status formed the basis of her discrimination claim, she has failed to exhaust her administrative remedies as to her race discrimination claim.

Loganathan cannot cure this defect. Under Virginia law and Title VII, Loganathan had 300 days from the date of the last allegedly discriminatory act in which to file a charge. *See* 42 U.S.C. § 2000e-5(e)(1); Va. Code § 2.2-3907(A).[5] As Loganathan was terminated on February 11, 2025, she had until December 8, 2025 to file a charge alleging race discrimination. She failed to do so. Accordingly, her race discrimination claim is procedurally time-barred.

---

[5] Under a valid work-sharing agreement, an employee that files with the both the EEOC and the relevant state agency has 300 days to bring all charges. 42 U.S.C. § 2000e-5(e)(1); Va. Code § 2.2-3907(A).

**C.      Ferguson is Entitled to Summary Judgment on Loganathan's Discrimination Claims Related to Her PIP and Termination.**

The record is devoid of evidence that Loganathan's PIP and termination constituted discrimination based on her national origin and race.  Her claim fails as a matter of law both because she cannot make out a *prima facie* case of discrimination, and because there is no evidence that Ferguson's justifications for terminating her—her performance as a manager and failure to improve on the PIP—were a pretext for unlawful discrimination. Title VII prohibits employers from discriminating against an individual "with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin[.]" 42 U.S.C. § 2000e-2(a)(1).  Discrimination claims under Title VII and the VHRA use "substantially identical language" and "are measured by the same standard." *Morton v. Froehling & Robertson, Inc.*, 786 F. Supp. 3d 965, 972 (E.D. Va. 2025), *aff'd,* No. 25-1744, 2025 WL 3707798 (4th Cir. Dec. 22, 2025).

Where a plaintiff relies on circumstantial evidence of discrimination, the court applies the burden-shifting framework established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  *Wannamaker-Amos v. Purem Novi, Inc.*, 126 F.4th 244, 255 (4th Cir. 2025).  Under this framework, the plaintiff must first make a *prima facie* case of discrimination. *Id.* (citing *Haynes v. Waste Connections, Inc.*, 922 F.3d 219, 223 (4th Cir. 2019)).  By itself, however, the *prima facie* case method is "never . . . sufficient to permit a plaintiff to escape an adverse summary judgment ruling." *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310, 318 (4th Cir. 2005).  If the plaintiff establishes a *prima facie* case, the employer must "articulate a legitimate, non-discriminatory justification for its allegedly discriminatory action." *Id.*  This burden is one of explanation, not persuasion; "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the

16

plaintiff." *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981). The burden then shifts back to the plaintiff to prove that the employer's neutral reasons were pretext for discrimination. *Wannamaker-Amos*, 126 F.4th at 255.

### 1. Loganathan Fails to Make a *Prima Facie* Case of Discrimination.

To establish a *prima facie* case of race or national origin discrimination, the plaintiff must demonstrate: (1) membership in a protected class; (2) satisfactory job performance for the position at issue; (3) an adverse employment action; and (4) that the adverse action occurred under circumstances giving rise to an inference of unlawful discrimination. *Id.*; *Sempowich v. Tactile Sys. Tech., Inc.*, 19 F.4th 643, 649–650 (4th Cir. 2021); *Thatch v. Fedex Freight, Inc.*, No. 2:23-CV-336, 2024 WL 3874436, at *3 (E.D. Va. July 18, 2024) (Walker, J.), *aff'd,* No. 24-1781, 2025 WL 957475 (4th Cir. Mar. 31, 2025). Loganathan is unable to do so for multiple reasons.

### a. The PIP Was Not an Adverse Employment Action.

To the extent Loganathan brings claims based on her PIP and related performance counseling, such claims fail at the *prima facie* stage. The Fourth Circuit has held that where a PIP does not result in lower pay, a demotion, being passed over for a promotion, precluding a bonus, or significantly altering job duties, it is not an adverse employment action. *Jensen-Graf v. Chesapeake Employers' Ins. Co.*, 616 F. App'x 596, 598 (4th Cir. 2015); *Reed v. Metro. Wash. Airports Auth.*, No. 1:24-cv-212 (RDA/WBP), 2026 WL 852125, at *13 (E.D. Va. Mar. 27, 2026). Where a PIP provides an employee the "opportunity to correct her unsatisfactory performance" but does not assign her different duties, alter her title, compensation, or limit future opportunities, it is little more than "documented counseling." *Walsh v. HNTB Corp.*, 169 F.4th 330, 341 (1st Cir. 2026); *see also McNeal v. City of Blue Ash, Ohio*, 117 F.4th 887, 903 (6th Cir. 2024); *Arnold v.*

*United Airlines, Inc.*, 142 F.4th 460 (7th Cir. 2025) (holding that a PIP which alters assignments within the normal scope of an employee's employment is not an adverse action).

Here, Loganathan's PIP required her to complete additional training and to document and report various management activities. *See* SOF ¶ 42; **Ex. 23**. However, the record contains no evidence that it impacted her compensation, resulted in a demotion, precluded a promotion, or otherwise impacted the terms and conditions of her employment. *See Jensen-Graf*, 616 F. App'x at 598. Accordingly, to the extent Loganathan claims the PIP constituted an adverse employment action, that claim fails and summary judgment should be granted in favor of Ferguson.

### b.  Loganathan Fails to Establish Her Job Performance Met Ferguson's Legitimate Expectations.

The undisputed evidence demonstrates that at the time of her termination in February 2025, Loganathan was not performing her job in a satisfactory manner. Loganathan's speculation to the contrary is insufficient to give rise to an inference of unlawful discrimination. *See Francis*, 452 F.3d at 308. Though a plaintiff need not have been a perfect employee, she must be able to show that she was qualified and "meeting her employer's legitimate expectations." *Wannamaker-Amos*, 126 F.4th at 256. This standard is not met when a plaintiff cannot produce significant evidence to refute the employers' documented concerns regarding the plaintiff's performance. *See Davis v. Nissan N. Am., Inc.*, 693 F. App'x 182, 184 (4th Cir. 2017) (affirming summary judgment for employer in case involving employee on PIP).

Here, Ferguson extensively documented deficiencies with Loganathan's performance as a manager. *See* SOF ¶¶ 7–11, 33–38, 40. Although Loganathan received an "effective performance" review for the period from February to July 2024, this review extensively detailed areas in which Loganathan needed to improve her employment. *See* SOF ¶¶ 33–36. Between June and November 2024, Ferguson received significant and consistent negative feedback about Loganathan's

18

performance as a manager from peers, direct reports, other managers, and stakeholders.  *See* SOF ¶¶ 8–11, 34–35, 37–38, 40, 42.  Loganathan offers no refutation that all of this feedback was false or contrived.  *See Davis*, 693 F. App'x at 184.  *Cf. Wannamaker-Amos*, 126 F.4th at 255 (concluding plaintiff met *prima facie* element based on "ample evidence to demonstrate a material issue of fact as to all eight incidents").  Nor can she dispute that multiple managers determined and documented in writing that in the intervening weeks and months, including while on a PIP, Loganathan was not adequately demonstrating receptiveness to feedback and improvement in her role.  *See* SOF ¶¶ 11, 34, 37–38, 42, 44, 50.  Loganathan's self-serving characterizations that she was performing adequately are insufficient to satisfy this element of her *prima facie* burden.  *See Reed*, 2026 WL 852125 at *10 (citing *Evans*, 80 F.3d at 960–61).

### c. There is No Evidence Supporting an Inference of Prohibited Discrimination.

At the *prima facie* stage, the Plaintiff must be able to adduce sufficient evidence to raise an inference of unlawful discrimination.  *Moore v. City of Charlotte, NC*, 754 F.2d 1100, 1105 (4th Cir. 1985).  Frequently, a plaintiff "must show that they were replaced by someone outside their protected class in order to make out a prima facie case." *Robinson v. Priority Auto. Huntersville, Inc.*, 70 F.4th 776 (4th Cir. 2023) (quoting *Miles v. Dell, Inc.*, 429 F.3d 480, 486 (4th Cir. 2005)).

In the disciplinary context specifically, a plaintiff might also show that (1) she engaged in prohibited conduct similar to that of a person of another race or national origin, and (2) "that disciplinary measures enforced against the plaintiff were more severe than those enforced against the other person." *Moore*, 754 F.2d at 1106.  To be meaningful though, "[t]he similarity between comparators and the seriousness of their respective offenses must be clearly established." *Lightner v. City of Wilmington, N.C.*, 545 F.3d 260, 265 (4th Cir. 2008) (affirming summary judgment on

these grounds); *see also Thatch*, 2024 WL 3874436, at 2 n.2. Importantly, this analysis cannot rely on the plaintiff's "unsubstantiated allegations and bald assertions concerning her own qualifications and the shortcomings of her co-workers." *Evans*, 80 F.3d at 960 (holding that the plaintiff failed to disprove her employer's explanation and affirming summary judgment). "Speculative and conclusory allegations cannot sustain a race discrimination claim." *Thatch*, 2024 WL 3874436, at *4. To do otherwise, would ascribe personal conflicts to race and "turn the workplace into a litigious caldron of racial suspicion." *Id.* (quoting *Hawkins v. PepsiCo, Inc.*, 203 F.3d 274, 282 (4th Cir. 2000)).

Loganathan's initial complaints to Ferguson were utterly devoid of any allegation—let alone evidence—that her treatment had anything to do with her race or national origin. *See* **Ex. 18**; **Ex. 12**; **Ex. 17**; **Ex. 25**; Nair Decl. ¶ 25. Her discovery responses likewise add no support. Notably, when asked in written discovery to identify every discriminatory act taken against her, she identified only her mental health treatment records. *See* **Ex. 11** at Supp. Resps. to Inter. Nos. 15, 16; **Ex. 32** at Resps. to Inter. Nos. 15, 16. However, she did not specifically identify any treatment records in her interrogatory answer, and none of the records she produced mention race or national origin as the basis for Ferguson's alleged discrimination. *See id.*[6]

Plaintiff alleges in her Amended Complaint that two employees—Will Parks and Jeanine Wandera—were treated differently from her. *See* Am. Compl., Dkt. No. 18 ¶ 24. In discovery, though, Loganathan supplied virtually no facts supporting this claim, other than her bare assertions that: (1) for Parks, Nair recommended "a constructive conversation" and ensuring Parks followed

---

[6]    Although Loganathan failed to designate any of these records as "Confidential" pursuant to the Agreed Protective Order (Dkt. No. 23), Ferguson will not publicly file any of her mental health treatment records on the Court docket as an exhibit. Ferguson reserves the right to submit them under seal in Reply if Loganathan challenges the statements made in the foregoing sentence.

feedback, and (2) Wandera received multiple oral warnings before being placed on a PIP. **Ex. 11** at Supp. Resp. to Inter. No. 11. Loganathan acknowledges that like her, Wandera was placed on a PIP. *Id.* Not only is this insufficient to meet her *prima facie* burden, but the evidentiary record establishes that Parks and Wandera are not legitimate comparators.

As a preliminary matter, like Loganathan, Wandera's employment *was* terminated during her PIP period, so she is not a comparator treated more favorably than Loganathan for purposes of an adverse employment action. *See* SOF ¶ 55.

Indeed, neither Parks's nor Wandera's situation is comparable to Loganathan. "[T]o establish a valid comparator, the plaintiff must produce evidence that the plaintiff and comparator "dealt with the same supervisor, [were] subject to the same standards and ... engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Haynes*, 922 F.3d at 223–24. First, both Parks and Wandera were performing in individual contributor positions, rather than manager roles, and unlike Plaintiff, neither exhibited issues managing employees. SOF ¶ 56. Instead, each exhibited performance concerns that were associated with technical performance aspects of their software development roles. SOF ¶ 57. Further, unlike Loganathan, both Parks and Wandera were receptive to and attempted to incorporate performance feedback. SOF ¶ 58. Loganathan has failed to adduce evidence that these two individuals are sufficiently similar to give rise to an inference that her termination was discriminatory, and therefore her claim fails because the record lacks evidence that her termination was discriminatory. *See Jones v. Eli Lilly & Co.*, No. 23-1502, 2025 WL 1823950, at *2 (4th Cir. July 2, 2025) (affirming summary judgment for employer where alleged comparator exhibited different performance deficiencies).

### 2. Loganathan's Dismissal for Documented Performance Deficiencies Constitutes a Non-Discriminatory Reason for her Termination.

21

In addition to Loganathan not establishing a *prima facie* case, Ferguson can meet its minimal burden of production to articulate a legitimate non-discriminatory reason for terminating Loganathan's employment. *See Reeves*, 530 U.S. at 142. "Job performance" is "widely recognized as [a] valid, non-discriminatory bas[is] for any adverse employment decision." *Evans*, 80 F.3d at 960. As detailed extensively herein, Ferguson's articulated reasons for terminating Loganathan's employment were her unsatisfactory job performance and her failure to improve while on a PIP. *See* SOF ¶¶ 7–11, 25, 33–38, 40–42, 50; *supra* § III.C.1.b. Accordingly, Ferguson meets its burden to articulate a legitimate non-discriminatory reason for Loganathan's termination, and the burden reverts to her to establish pretext, which she has not done.

### 3. Loganathan is Unable to Establish that Her Termination Was a Pretext for Discrimination.

In addition to her *prima facie* case deficiency, Ferguson has articulated a legitimate, non-discriminatory reason for the decision to terminate her, so Loganathan "must present proof that the company's explanation is pretextual and that she was the victim of intentional discrimination." *Evans*, 80 F.3d at 960 (explaining the summary judgment standard). Loganathan is unable to do so. *See Love-Lane v. Martin*, 355 F.3d 766, 786 (4th Cir. 2004) (upholding summary judgment for the employer); *Hood-Wilson v. Bd. of Trs. of Cmty. Coll. of Baltimore Cnty.*, 162 F.4th 101, 105–06 (4th Cir. 2025) (upholding summary judgment and reasoning that "it is frequently in carrying her *ultimate* burden of showing [an adverse action] based on discrimination that a plaintiff's claim fails").

"[T]o show pretext, a plaintiff may show that an employer's proffered nondiscriminatory reasons for the termination are inconsistent over time, false, or based on mistakes of fact." *Sempowich*, 19 F.4th at 652. Additionally, the plaintiff may present statements of animus or treatment of comparators. *See Hollis v. Morgan State Univ.*, 153 F.4th 369, 381 (4th Cir. 2025).

However, a plaintiff's dispute with the merits of the employer's evaluation is not enough. *Hawkins*, 203 F.3d at 280. The Fourth Circuit has "repeatedly held that in a wrongful discharge action it is the perception of the decision maker which is relevant, not the self-assessment of the plaintiff." *Id.* (internal quotes deleted). Thus, in order to establish pretext, the plaintiff must provide evidence that they were performing at a satisfactory level. *See Sempowich*, 19 F.4th at 651 (finding evidence of pretext when the plaintiff established good performance in multiple forms, including a positive review 12 days before reassignment). The Court will not "impute a racial character" to ordinary disagreements between an employee and management. *Hawkins*, 203 F.3d at 281.

Here, as described in Section III.C.1.b, *supra*, Loganathan's struggles and underperformance as a manager were extensive and were documented by multiple managers, peers, and stakeholders. Indeed, Loganathan does not claim that the majority of these individuals who provided constructive feedback discriminated against her. *Compare* **Ex. 11** at Supp. Resp. to Inter. No. 15, *with* **Ex. 9**. During the PIP process, apparently recognizing her weaknesses, Loganathan herself requested that she return to an individual contributor role, rather than remain in a management position. However, no such role was available, and Ferguson is not required to create one. *See* SOF ¶ 49. The record is devoid of any evidence that her PIP and termination were based on her race or national origin. *See* § III.C.1.c; *Evans*, 80 F. 3d at 960 (articulating plaintiff's burden to adduce "proof that the company's explanation is pretextual and that she was the victim of intentional discrimination").

Accordingly, the Court should grant summary judgment in Ferguson's favor on Loganathan's discrimination claims based on the evidence of her inadequate performance and lack of evidence of pretext.

**D.    Ferguson is Entitled to Summary Judgment on the Retaliation Claims.**

Loganathan's retaliation claims also fail. First, Loganathan did not engage in protected activity under Title VII or the VHRA until she filed her EEOC Charge in March 2025, *after* the adverse employment actions of which she complains. None of her previous reports to Ferguson raised any allegation of unlawful conduct under applicable laws. Nor can she establish that her PIP was an adverse employment action, that there is a causal connection between her complaints and her termination, or that her termination in February 2025 was pretext for retaliation.

Title VII and the VHRA prohibit unlawful retaliation against an employee who "has opposed any practice made an unlawful employment practice." 42 U.S.C. § 2000e-3(a); *see also* Va. Code § 40.1-27.3 (forbidding retaliation against an employee who "in good faith reports a violation of any federal or state law or regulation to a supervisor[.]"). Protected activity includes complaints about unlawful discrimination. *Roberts v. Glenn Indus. Grp., Inc.*, 998 F.3d 111, 122 (4th Cir. 2021). To defeat summary judgment on a retaliation claim, a plaintiff must establish a *prima facie* case of retaliation by showing that (1) she engaged in protected activity; (2) her employer took a materially adverse action against her; and (3) "a causal nexus existed between the protected activity and the adverse action." *Massaro v. Fairfax Cnty.*, 95 F.4th 895, 902 (4th Cir. 2024) (citing *Foster v. Univ. of Maryland-E. Shore*, 787 F.3d 243, 250 (4th Cir. 2015)). If the plaintiff establishes a *prima facie* case, the court applies the remainder of the *McDonnell Douglas* test, evaluating whether the employee provided a "legitimate, non-discriminatory reason" for their action and, if so, "whether the employee can show that the reason is false, and ultimately, that employer retaliated against him." *Laber v. Harvey*, 438 F.3d 404, 432 (4th Cir. 2006) (en banc) (affirming summary judgment). "The elements of a retaliation claim under Title VII . . . and the VHRA are the same," so the analysis will be performed together. *Morton*, 786 F. Supp. 3d at 976.

24

### 1. Loganathan Did Not Engage in Any Protected Activity Until After Her Termination.

"Title VII prohibits an employer from discriminating against an employee because [s]he has opposed any practice made an unlawful employment practice by [Title VII], or because [s]he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under Title VII." *Holloway v. Maryland*, 32 F.4th 293, 299 (4th Cir. 2022) (internal citations and quotation marks omitted). Loganathan's claims are all based on conduct that occurred before she filed her Charge of Discrimination in March 2025, so she must establish retaliation based on opposing an unlawful practice. *See id.* Summary judgment in favor of the employer is warranted when an employee's EEO complaints do not allege "unlawful" discrimination, rather than complaints about workplace conduct "in a general sense" without regard to protected classification. *See Monk v. Potter*, 723 F. Supp.2d 860, 879–80 (E.D. Va. 2010).

Although in a few instances Loganathan used the phrase "retaliation" to describe her alleged treatment by Nair after she requested a transfer, she never complained to Ferguson that such "retaliation" was based on any legally protected activity under Title VII or the VHRA. *See* SOF ¶¶ 43–48; Nair Decl. ¶ 21. Even her formal discovery responses fail to establish that she engaged in protected activity, rather than raising generalized complaints about Nair's management practices. With respect to allegedly "retaliatory acts," Loganathan cites only to her Complaint, her "EEO Tickets," and her "supplemental response to Interrogatory No. 2." *See* **Ex. 11** at Supp. Resps. to Inter. Nos. 2, 18; **Ex. 32** at Resp. to Inter. No. 17. But none of these documents or interrogatory answers indicate that she was retaliated against on the basis of protected activity, e.g. reporting discrimination or harassment on the basis of national origin or race. *See id.*; **Ex. 12**; **Ex. 25**; **Ex. 24**; **Ex. 22**. Indeed, nothing in the record indicates Loganathan ever reported to Ferguson

25

the only instances she claims her race or national origin was a factor in an adverse employment action—the alleged pay statements by Nair. *See* **Ex. 11** at Supp. Resps. to Inter. Nos. 2, 18; **Ex. 32** at Resp. to Inter. No. 17; **Ex. 12**; **Ex. 25**; **Ex. 24**; **Ex. 22**; **Ex. 4** at 189:18–23 (testifying that she did not report alleged pay comments by Nair). Accordingly, Loganathan fails to establish the first element of her *prima facie* case.

### 2. Loganathan's Placement on a PIP Was Not an Adverse Action.

For the same reasons described in Section III.C.1.a, *supra*, although termination constitutes an adverse action, Loganathan's placement on a performance improvement plan was not an adverse action, and most certainly not *materially* adverse. *See Jensen-Graf*, 616 F. App'x at 598 (affirming dismissal of retaliation claim based on placement on PIP). In the context of retaliation, courts employ a distinct standard for assessing harm. *Herkert v. Bisignano*, 151 F.4th 157, 165 (4th Cir. 2025). While discrimination claims require only a showing of *some harm*, retaliation claims require an adverse action that caused "significant harm" or was "materially adverse." *Id.* at 165–66 (citing *Muldrow v. City of St. Louis*, 601 U.S. 346, 350, 357 (2024)). These harms must be "serious enough to dissuade a reasonable worker from making or supporting a charge of discrimination." *Muldrow*, 601 U.S. at 358; *see also Kelley v. Mayorkas*, 694 F. Supp. 3d 715, 731 (E.D. Va. 2023) (Walker, J.) (finding that the plaintiff could not defeat summary judgment by merely "rely[ing] on matters pleaded in the complaint" without providing "any evidence to support the allegations.").

"[C]ourts in this circuit have repeatedly held that . . . reprimands, performance improvement plans, and negative performance evaluations do not constitute materially adverse action." *Reed*, 2026 WL 852125, at *13 (quoting *Harris v. Herring*, 2021 WL 100651, at *7 (E.D. Va. Jan. 12, 2021)).; *see Parsons v. Wynne*, 221 F. App'x 197, 198–99 (4th Cir. 2007) (affirming summary judgment on the grounds that negative performance evaluations are not materially

adverse actions). Accordingly, to the extent Loganathan claims her performance counseling and PIP were retaliatory, she fails to establish this element of her *prima facie* case.

### 3. The Record Does Not Establish a Causal Nexus Between Protected Activity and Loganathan's Termination.

Finally, Loganathan cannot establish a causal connection between any protected activity and any adverse action. To demonstrate a causal connection, "the employer must have taken the adverse employment action *because* the plaintiff engaged in protected activity." *Perkins v. Int'l Paper Co.*, 936 F.3d 196, 214 (4th Cir. 2019) (quoting *Dowe v. Total Action Against Poverty*, 145 F.3d 653, 657 (4th Cir. 1998)). In other words, a plaintiff must show that the employer was actually motivated by a desire to retaliate against her for protected activity. *Villa v. CavaMezze Grill, LLC*, 858 F.3d 896, 903 (4th Cir. 2017). A plaintiff may "establish a causal connection between the protected activity and the adverse action" with the "existence of relevant facts alone, or together with temporal proximity." *Roberts*, 998 F.3d at 122 (affirming summary judgment on these grounds). The "plaintiff must show that the decisionmaker was aware of the protected activity at the time the alleged retaliation occurred." *Id.* at 124. However, claims relying on protected activity fail where the protected activity followed the initiation of the disciplinary process. *See Mitchell v. Booz Allen Hamilton, Inc.*, No. 1:23-cv-00653, 2024 WL 993872, at *6 (E.D. Va. Mar. 7, 2024) (rejecting claim of retaliation based on temporal proximity where pre-termination actions predated plaintiff's engagement in protected activity).

Here, the solicitation of feedback on Loganathan's performance in connection with her annual review predated any of her complaints to human resources. *See* SOF ¶¶ 7–11, 43, 45, 46. And crucially, the non-adverse PIP was already being contemplated by Loganathan's manager before she submitted her complaint. *See* SOF ¶ 37, 43, 45; *Mitchell*, 2024 WL 993872, at *6. Moreover, Loganathan's termination on February 11, 2025 was roughly three months after

27

Ferguson closed the human resources case on her complaint.  *See* SOF ¶ 46; *Roberts*, 998 F.3d at 127 (three-month gap between protected activity and termination insufficient).

### 4. Ferguson's Decision to Terminate Loganathan Was Justified and She Cannot Demonstrate Pretext for Retaliation.

Not only does Loganathan fail to make out a *prima facie* case of retaliation, Ferguson has established legitimate non-retaliatory reasons for the one adverse employment action.  As demonstrated in Section III.C, the decision to terminate Loganathan's employment was based on her performance issues, lack of receptiveness to constructive criticism, and failure to adequately improve her performance during the PIP period.[7]  These persisting issues resulted in her termination.  Accordingly, the Court should grant summary judgment in Ferguson's favor on plaintiff's retaliation claims.

### E. Loganathan's Unsupported Pay Discrimination Claim Fails.

Finally, Loganathan alleges in her Amended Complaint that Ferguson, through her supervisor, "told Plaintiff that her pay could not match her U.S. citizen peers due to her visa status." Am. Compl., Dkt. No. 18 ¶ 17.  In discovery, Loganathan claimed that Nair—himself an Indian immigrant who was previously on a work visa—told her on three separate occasions, that her "pay could not match with U.S. citizen peers due to [her] visa status and [she is] an Indian." **Ex. 11** at Supp. Resp. to Inter. No. 19.  Loganathan presents no contemporaneous documentation that this statement was ever made, despite keeping a spreadsheet tracking her concerns and submitting a human resources complaint to Ferguson.  *See* **Ex. 12**; **Ex. 17**. Nor was this claim raised in her lawyer's demand letter in January 2025.  **Ex. 13**.  Nair denies making these alleged statements. Nair Decl. ¶ 32.

---

[7]    Indeed, from the outset of the PIP period, Loganathan was applying for jobs with other companies and even accepted one on January 29, 2025, two weeks before her employment with Ferguson ended.  SOF ¶ 51.

"The law is well established that uncorroborated, self-serving testimony of a plaintiff is not sufficient to create a material dispute of fact sufficient to defeat summary judgment." *DiQuollo v. Prosperity Morg. Corp.*, 984 F. Supp. 2d 563, 570 (E.D. Va. 2013). "Simply put, a plaintiff's uncorroborated claim that someone said something, supported only by an unsigned affidavit attributing those statements to that person and adamantly disavowed under oath, is not evidence of anything." *Id.* (finding plaintiff's uncorroborated claim that an individual made discriminatory statements fails to sufficiently adduce direct evidence of discrimination).[8]  Without more, Loganathan's self-serving and uncorroborated claim about Nair's alleged statements fails to establish a genuine dispute of material fact on the issue of discrimination.

Indeed, Loganathan's written communications about her compensation contradict her account. First, when Loganathan accepted her promotion, she wrote to Nair that she was concerned that the offered salary, which was within the pay range for her position, "appears to align with the lower end of the salary mentioned in the job description." She asked if Ferguson could "revisit and assess my performance after six months with the potential for a salary increase." SOF ¶ 15. In fact, in October 2024, Loganathan received a 17.6% pay raise, which placed her in the median for her position. *See* SOF ¶¶ 13, 23. Second, in January 2024, she complained about lower-than-expected take home pay because of a tax withholdings issue—not because of her race or national

---

[8]    Even if the alleged statement is considered "direct evidence" of discrimination, Loganathan has failed to identify record evidence that can establish key aspects of a direct evidence claim, including a connection between the alleged comments and "the actions of an actual decisionmaker" who was "principally responsible for the decision or the actual decisionmaker for the employer." *See Schafer v. Md. Dept. of Health & Mental Hygiene*, 359 F. App'x 385, 389 (4th Cir. 2009). Indeed, the alleged statement Loganathan appears to rely on (that her pay could not match her peers because she is Indian and, on a visa,) neither specifically identifies a decision nor a decisionmaker.

29

origin.  That basis for her take home pay was explained to her, and she incurred no financial loss. *See* SOF ¶¶ 17–20.

Loganathan has adduced virtually no evidence to support her pay discrimination claim.  In terms of her comparators, Loganathan identifies only one colleague—Chen Liang—an employee she claims was paid more than her.  **Ex. 11** at Supp. Resp. to Inter. No. 20.  But her interrogatory answers are bereft of factual detail, on this claim. *See id.* At her deposition, Loganathan offered only limited testimony regarding Liang's background and compensation, and could not testify to his experience, prior salary, salary demands to Ferguson, educational background, or visa status. **Ex. 4** at 156:18–161:3.  What Loganathan proffers falls well short of her burden to establish a *prima facie* case of pay discrimination under Title VII. *See Spencer v. Va. State Univ.*, 919 F. 3d 199, 207 (4th Cir. 2019) (explaining that under Title VII, "the plaintiff must provide evidence that the proposed comparators are not just similar in some respects, but similarly-situated *in all respects*" (emphasis in original)).

Finally, as noted at the outset of this Memorandum, any claims based on allegedly discriminatory payments before May 23, 2024—300 days before Loganathan filed her Charge of Discrimination—are time barred. *See* 42 U.S.C. § 2000e-5; *Mikula v. Allegheny Cty. of Pa.*, 583 F.3d 181, 186 (3d Cir. 2009).

## IV.    CONCLUSION

For the above reasons, the Court should grant Ferguson summary judgment on all Plaintiff's claims.

Respectfully Submitted
**FERGUSON ENTERPRISES, LLC**
By Counsel

*/s/ Robert W. McFarland*

30

Robert W. McFarland (VSB No. 24021)
Amy Morrissey Turk (VSB No. 44957)
MCGUIREWOODS LLP
World Trade Center
101 West Main Street
Suite 9000
Norfolk, VA 23510
T: (757) 640-3711
F: (757) 640-3942
rmcfarland@mcguirewoods.com
aturk@mcguirewoods.com
cretzloff@mcguirewoods.com

Richard J. Batzler (VSB No. 95689)
MCGUIREWOODS LLP
1750 Tysons Blvd., Suite 1800
Tysons, VA 22102
T: (703) 712-5000
F: (703) 712-5050
rbatzler@mcguirewoods.com

31

**Appendix - Table of Exhibits**

| Exhibit Number | Description |
|---|---|
| 1. | Declaration of Rajat Nair |
| 2. | EEO and Harassment Prevention Policy (FERGUSON-0000109 – FERGUSON-000015; FERGUSON-0000117) |
| 3. | Loganathan WD Personnel File Summary (Excerpts) |
| 4. | Apr. 15, 2026 Deposition Transcript of Loganathan (Excerpts) |
| 5. | FY24 Midyear Performance Checkpoint (FERGUSON-0000019 – FERGUSON-0000021) |
| 6. | Ferguson Colleague Feedback about Loganathan (FERGUSON0000461) |
| 7. | Ferguson Colleagues and Vendors Feedback about Loganathan (FERGUSON0000496 – FERGUSON0000497) |
| 8. | Oct. 30, 2024 Feedback from FTE's (FERGUSON0000459 – FERGUSON0000460) |
| 9. | Nov. 1, 2024 A. Lautenslager Feedback (FERGUSON0000491) |
| 10. | Loganathan Text Message re Position Acceptance (P476) |
| 11. | July 10, 2026 - Plaintiff's Supplemental Responses to Interrogatories (Excerpts) |
| 12. | Investigation Report (FERGUSON0000482 – FERGUSON0000488) |
| 13. | Jan. 15, 2025 Demand Letter (P55 – P59) |
| 14. | Jan. 26, 2024 H. Rogers email chain re Take-Home Pay (FERGUSON0000492 – FERGUSON0000495) |
| 15. | FY24 Compensation Statement (P26) |
| 16. | Sept. 6, 2024 Loganathan Chat (FERGUSON0000479) |
| 17. | Loganathan Observations Post 0906 |
| 18. | Oct. 28, 2024 Loganathan Chat with H. Rogers (P118 – P120) |
| 19. | FY24 Annual Review (FERGUSON-0000001 – FERGUSON-0000005) |
| 20. | Nov. 20, 2024 R. Nair Email Chain re Team Feedback on Loganathan (FERGUSON0000496 – FERGUSON0000497) |
| 21. | Nov. 10, 2024 M. Hicks Email Chain re 11-5-2024 follow up (P69 – P71) |
| 22. | Nov. 22, 2024 M. Loganathan Email Chain re PIP (P47 – P51) |
| 23. | Loganathan Performance Improvement Plan (FERGUSON-0000277 – FERGUSON-0000283) |
| 24. | Nov. 12, 2024 M. Loganathan Email to H. Rogers addressing multiple concerns including I-140 Petition Processing (FERGUSON0000471 – FERGUSON0000472) |
| 25. | Nov. 13. 2024 Associate Workplace or EEO Concern Request FERGUSON0000480 – FERGUSON0000481) |
| 26. | Screen Shot – Case Details - Associate Workplace or EEO Concerns – Rajat Nair (P1) |
| 27. | Dec. 6, 2024 Notes of Follow up Discussion – PIP (P101 – P102) Limit to 101-102 or provide Complete Document? |
| 28. | Jan. 28, 2025 HTC Offer Letter (P121 – P122) |

| Exhibit Number | Description |
| --- | --- |
| 29. | Nov. 22, 2024 Loganathan Email Chain re Clarification on Performance Improvement Plan (P77 – P82) |
| 30. | U.S Associate Policy Handbook (Excerpts) |
| 31. | Charge of Discrimination (FERGUSON-0000092 – FERGUSON-0000095) |
| 32. | Apr. 6, 2026 - Plaintiff's Responses to Interrogatories (Excerpts) |

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on July 17, 2026, a copy of the foregoing document was electronically filed with the Clerk of Court using the CM/ECF system, which will send an electronic notification of the same (NEF) to all counsel of record.

**FERGUSON ENTERPRISES, LLC**
By Counsel

*/s/ Robert W. McFarland*
Robert W. McFarland (VSB No. 24021)
McGUIREWOODS LLP
World Trade Center
101 West Main Street
Suite 9000
Norfolk, VA 23510
T: (757) 640-3711
F: (757) 640-3942
rmcfarland@mcguirewoods.com

*Counsel for Defendant Ferguson Enterprises, LLC*

34