**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**NEWPORT NEWS DIVISION**

MANIMEGALAI LOGANATHAN,

     Plaintiff,

 vs.

FERGUSON ENTERPRISES LLC,

     Defendant.

Case No.: 4:25-cv-120 (JKW) (RJK)

**DECLARATION OF MANIMEGALAI LOGANATHAN IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

   Manimegalai Loganathan declares, pursuant to 28 U.S.C. § 1746, under penalty of perjury, that the following is true and correct:

   1.  I am the Plaintiff in this action.

   2.  As such, I have personal knowledge of the facts and circumstances set forth herein based on my own experiences and observations, as well as my review of documents maintained by me or available to me in connection with my employment at Ferguson.

   3.  I respectfully submit this declaration in opposition to Defendant's motion for summary judgment.

   4.  I worked for Ferguson Enterprises LLC ("Ferguson" or the "Defendant") from July 2, 2018 through February 11, 2025.

   5.  I began as an IT QA Analyst III and later served in Business Analyst and Business Systems Analyst roles before Ferguson promoted me to Manager – Software Engineering, effective December 1, 2023.

   6.  During my employment, I received four promotions.

   7.  Before the disputed performance process, I consistently received Effective or Highly Effective annual performance ratings.

8.    In my first partial year as a manager, Ferguson rated my overall FY2024 performance "3 – Effective Performance." My review identified development areas for the year ahead but did not state that I was failing, that my job was at risk, or that a Performance Improvement Plan ("PIP") was imminent; in fact, it included positive feedback, like "Mani collaborated with cross-functional teams to ensure the timely delivery of deliverables, consistently exceeding schedule expectations without compromising on quality. She maintained a transparent and open line of communication with team members, leadership, and stakeholders. Since assuming the role of Manager of Shared Services, Mani has been immersed in learning about the new teams and engaging with business stakeholders. Over the past two months, she has focused on familiarizing herself with the expanded scope of responsibilities and building relationships with key stakeholders to facilitate a smooth transition into her managerial role," and "Mani has continued to enhance her technical expertise and people management skills. She is proactive in identifying and addressing SDLC challenges, holding team members accountable. Her passion for achieving business outcomes has been crucial in delivering results ahead of schedule and with high quality. Stakeholders regard Mani as a valuable partner, trusting her ability to successfully drive our business outcomes to completion." A true and correct copy is filed as **Def. Ex. 19, FY2024 Annual Review at FERGUSON-0000002-3.**

9.    During the review discussion, Rajat Nair ("Nair") did not identify the individuals who had provided feedback about me, did not give me the written feedback submissions, and did not tell me that a performance improvement plan was being considered.

10.    A true and correct copy of performance-review materials is filed as **Pl. Ex. 2, FY2019–FY2024 historical performance reviews (FY2020, FY2022, and FY2023 Annual Review "Highly Effective Performance" rating).**

2

11.     Ferguson recognized my work through an October 2023 Town Hall appreciation, a June 2024 Spotlight Award, and a December 2024 Gold Award. The October 2023 Town Hall appreciation predates my promotion to Manager – Software Engineering and is offered only as part of my historical recognition record, not as recognition during the PIP period. True and correct copies are filed as **Pl. Ex. 3 (October 2023 Town Hall Appreciation)** ("Mani brings thought leadership, accountability, technical acumen, and dedication to the teams she works with"; "Mani builds clear business requirements and mapping documents, always setting the team up for successful implementation. She is passionate about ensuring the team delivers business requirements on time"; "Mani brings a refreshing level of excitement and energy to her role and is a delight to work with"), **Pl. Ex. 4 (June 2024 Spotlight Award)** ("Mani exemplifies a proactive leadership style, fostering a can-do attitude within her teams. She is a dedicated and versatile leader who actively engages in finding innovative, out-of-the-box solutions to tackle challenging demands, never hesitating to roll up her sleeves and support her teams. […] Her commitment to elevating accountability and quality standards throughout our organization underscores her invaluable contribution to her teams and Ferguson"), and **Pl. Ex. 5 (December 2024 Gold Award)** (recognized for "IMPACT").

12.     After my promotion, I managed approximately seven teams comprising approximately forty Ferguson employees and contractors combined who supported multiple systems.

13.     I knew the scope of my responsibilities from my direct management duties, staffing assignments, organizational charts, team meetings, and regular business communications.

14.     I received positive feedback in my role. For example, on June 12, 2024, Julie Hedly stated that, considering the breadth of responsibilities assigned to me, I was "performing admirably." She also stated that I had been given a "vast amount of responsibility" as a new

manager, managed an unconventional team, oversaw associates working across four distinct system areas (showcasing my adaptability and commitment to mastering Ferguson's processes), had excelled in building relationships, and had proven to be a valuable member of the team. This feedback appears in **Def. Ex. 6**.

15. I am from India. Ferguson sponsored my employment-based immigration process, including my H-1B status and, beginning in approximately 2022, the employment-based permanent-residency process that included the PERM labor-certification application.

16. In approximately October 2024, the Department of Labor certified my PERM application. Ferguson did not proceed to the I-140 step at that time.

17. On or about November 12, 2024, Harrison Rogers ("Rogers") informed me that Ferguson was not prepared to proceed with I-140 processing because of my alleged performance issues. I understood that the process was being placed on hold until my performance improved.

18. In a November 12, 2024 email to Rogers, I explained that this matter was time-sensitive and could affect my work authorization, my family's immigration stability, and my children's education. A true and correct copy is filed as **Pl. Ex. 16**.

19. When I was promoted, my annual base salary was approximately $105,967. I contemporaneously believed the offer was near the lower end of the posted range and requested that Ferguson revisit it.

20. On or about November 17, 2023, I spoke with Nair by telephone about my compensation. During that conversation, Nair told me in substance that Ferguson could not match my compensation to American or U.S.-citizen peers because I was Indian and on a visa.

21. When I considered documenting or following up on the conversation, Nair told me not to document the conversation in Ferguson email. My call history and related communications from that period are filed as **Pl. Ex. 7**.

4

22.     I raised compensation concerns again in approximately January 2024 and approximately July or August 2024. During the later discussion, Nair again attributed the compensation disparity to the fact that I was Indian and on a visa.

23.     Nair is also Indian, but from a different state in India. Nair frequently spoke in a different dialect of the Indian language with other peers during work-related meetings so that I would not understand what they were discussing. Accordingly, I believe that Nair has discriminatory animus toward me on the basis of my race and national origin.

24.     In approximately July or August 2024, Nair accidentally shared with me an offer letter for Chen Liang ("Liang") – who held the same job title as me, worked in the same department, also reported to Nair, and whom I was on the hiring panel for his interview. Liang's offer letter stated a base salary of $150,000 and an annual bonus target of 15%. I do not have a copy of the offer letter; I am describing what I saw when Nair accidentally shared it with me. My own annual bonus target was also 15%, but again, my salary was comparatively less.

25.     Based on my work in the organization, I understood Liang to manage fewer teams and fewer personnel than I did. I do not have independent personal knowledge of Liang's citizenship or immigration status, other than that he appears to be non-Indian.

26.     Effective October 1, 2024, Ferguson increased my monthly base salary from $8,830.62 to $10,422.24 through two separate actions recorded on my FY24 Compensation Statement: a 2.8% performance-based merit increase (from $8,830.62 to $9,077.88) and a separate 14.80% adjustment identified on the statement under the heading "Other Awards - Additional Adjustment" (from $9,077.88 to $10,422.24). My annual bonus was paid at 17.05% of eligible earnings, above the 15% target. I received and reviewed the compensation statement during my employment. Based on the compensation-range information available to me in Workday, I understood that my original promotion salary was below the listed midpoint for my position and

5

that the October 2024 adjustment brought my salary approximately to that midpoint. True and correct copies of the compensation materials are filed as Pl. Ex. 10. Even after this increase, my annualized base salary of $125,066.88 remained approximately $24,933 below the $150,000 base salary stated in the offer letter I saw for Chen Liang. Before the increase, the difference was approximately $44,033. Because Liang's stated bonus target of 15% matched my own, the difference at target total compensation was approximately $28,673 after the increase and approximately $50,637 before it.

27.    On September 6, 2024, I asked Nair whether I could explore internal Ferguson opportunities, because of unresolved compensation concerns and increasing difficulties in my working relationship with Nair, including conduct that I believed undermined my managerial authority. He gave written approval.

28.    Before sending that message, I had been trying to speak with Nair about conduct that I believed was undermining my managerial authority, including a lack of transparency, direct communications with members of my teams, and redirection of work without involving me.

29.    Starting on and after September 6, I observed reduced availability from Nair, canceled or reduced one-on-one contact, exclusion from discussions, increased scrutiny, changes in my reporting structure, and a substantial reduction in my responsibilities. Before the reorganization, I managed approximately seven teams comprising approximately forty Ferguson employees and contractors combined. The reorganization plan known to me contemplated an assignment of approximately four teams, but I was ultimately assigned only two teams and approximately ten employees and contractors. **Def. Ex. 17.**

30.    On September 7, I withdrew my immediate plan to explore another role because I feared negative consequences and wanted to reduce the risk of retaliation.

6

31.    On October 28, 2024, I contacted Vice President Harrison Rogers and reported the changed treatment I had experienced after raising compensation concerns and exploring internal opportunities. I told him that I believed I was experiencing discrimination and retaliation. **Def. Ex. 18**.

32.    During my discussions with Rogers between October 28 and October 31, including the October 31 meeting with Rogers and Nair, I described the reduction in my responsibilities, changes in Nair's communication and availability, intimidating conduct, and my concern that the treatment constituted discrimination, retaliation, and workplace harassment. These concerns arose in the broader context of my prior compensation complaints and Nair's alleged statements regarding my Indian national origin and visa status.

33.    Ferguson's records later showed that Nair discussed a potential PIP with Michelle Hicks ("Hicks") on October 28 and documented that discussion on October 29. At the time of my October 28 complaint, I did not know that Ferguson was considering a PIP.

34.    Additional negative feedback was submitted after my October 28 complaint, including UST-related feedback dated October 30, anonymous feedback dated October 31, and Andrew Lautenslager's feedback dated November 1.

35.    Before the UST feedback, I had raised concerns about invoice discrepancies, underperforming vendor personnel, and removal or replacement of vendor resources. Those actions had financial consequences for the vendor, and I believed they created a potential conflict affecting the objectivity of later UST feedback. I identified that concern to Ferguson's investigator during my November 15, 2024 interview. **Pl. Ex. 16.**

36.    On October 31, I expressly characterized the conduct as retaliation and workplace harassment. Rogers told me that an HR matter would be opened and that HR would contact me.

7

37.     I was not provided a case number, investigator name, status update, or outcome for the matter Rogers said he would initiate. I later filed formal EEO or Associate Workplace Concern submissions on November 13 and November 15. I later learned from Ferguson's summary-judgment exhibits that internal EEO or EPG ticket records contained references involving Adam Feldberg and Hicks. I was not shown those internal ticket entries, given their case numbers, or informed of their contents while I was employed by Ferguson. True and correct copies of my November 13 and November 15 EEO or Associate Workplace Concern submissions are filed as **Pl. Ex. 14**. The internal ticket records referenced above were contained in Ferguson's summary-judgment exhibits.

38.     On or about November 1, 2024, Hicks became my direct manager, replacing Nair (other Managers with the same title as me continue to report to Nair, only my reporting structure changed).

39.     On November 5, Hicks imposed detailed documentation requirements concerning accomplishments, roadblocks, dates, individuals involved, and architectural decisions. When I asked what specific performance concern prompted those requirements, she referred generally to feedback from "multiple people." Relevant communications are filed as **Pl. Ex. 15**.

40.     I repeatedly asked Hicks, Adam Feldberg, and others for actual feedback, specific incidents, examples, dates, unmet expectations, and measurable standards so that I could understand and address the concerns. **See Def. Ex. 23** (I sought clarification on the PIP and expressed concerns about retaliatory nature); **Pl. Ex. 19** (I sought feedback and clarification on the PIP and expressed concerns about retaliatory nature).

41.     Despite same, I did not receive any such feedback.

42.     During my November 14, 2024 one-on-one meeting, Hicks told me that a Performance Improvement Plan was being prepared for me.

8

43.     I documented that conversation in an email sent shortly after midnight on November 15 and immediately clarified that the meeting occurred on November 14. References in my EEOC rebuttal to November 6 or November 6–7 as the first notice date were mistakes. November 14 is the correct date.

44.     Before November 14, I had not received a clear disciplinary warning, a defined correction period, measurable standards tied to specific incidents, notice that my job was at risk, or a meaningful opportunity to improve under clearly communicated expectations.

45.     Hicks and Adam Feldberg discussed the PIP, issued in writing dated November 21, 2024, with me during a November 22 meeting. I requested permission to record the meeting because I believed earlier discussions had been inaccurately summarized and wanted an accurate record, but Feldberg declined. I still participated. The recording-request communications are filed as **Pl. Ex. 22**.

46.     During the November 22 PIP discussion, I asked to return to my former Business Systems Analyst role or another individual-contributor position. I made that request to preserve my employment and pending immigration processing while disputing the fairness of the PIP. It was not an admission that I could not perform as a manager.

47.     On December 6, Hicks informed me that there was no BSA opening "in our org." She also stated that she had submitted the PIP and that I should then be able to see it in Workday. In that same meeting, Adama and Michelle suggested that I might not be successful in the PIP, due to my seeking clarification. **Pl. Ex. 19**.

48.     I acknowledged the PIP on December 9. The December 6–9 submission and acknowledgment communications are filed as **Pl. Ex. 19**. Here, I included a comment that "I strongly believe that this action may be retaliatory in nature. Prior to being placed on the PIP, I

9

was not informed of any performance issues, either orally or in writing, which is inconsistent with the general Ferguson PIP policy followed for other employees."

49. Nonetheless, I began assigned training and continued my regular duties.

50. On December 6, Hicks initially stated that I had not begun training, but later acknowledged that statement was incorrect and apologized.

51. I attended ERP training from December 16 through December 20, was on previously approved vacation from December 23 through January 3, and used approximately three sick days during the PIP period.

52. The written PIP was dated November 21, discussed with me on November 22, entered by Hicks in Workday on December 6, acknowledged by me on December 9, and stated an anticipated February 18, 2025 end date. I worked approximately twenty-nine business days after acknowledgment before Ferguson terminated me on February 11, 2025, excluding holidays, approved leave, training, and other non-working days.

53. Throughout this time, I continued asking for specific examples, dates, measurable expectations, and feedback concerning my progress.

54. In spite of same, Ferguson never provided me a transparent end-of-PIP comparison showing which objective requirements I failed, what improvement was required by specific dates, or how my actual work was measured against those standards.

55. After my promotion, I attended multiple Ferguson manager-training sessions virtually. One session addressed how managers should respond to associate performance concerns. Based on my recollection, the training described providing feedback or counseling and giving the associate a reasonable opportunity to improve before escalating the matter to a formal PIP.

56. I also relied on Ferguson's Quick How To Guide in understanding its ordinary performance-management process. A true and correct copy is filed as **Pl. Ex. 17**. I understood that

my employment was at will and that progressive discipline was not guaranteed in every circumstance; however, I observed that progressive discipline seemed to be followed for non-Indians.

57.    I personally observed that Will Parks ("Parks") was receptive to feedback. Nair later recommended a constructive verbal discussion, written follow-up, and time for Parks to incorporate feedback and improve. The relevant email is filed as **Pl. Ex. 21**.

58.    Jeanine Wandera ("Wandera") formally reported to Paul Koneczny ("Koneczny") but worked on my team, and her performance affected my team's deliverables. I personally observed missed or delayed deliverables and participated in performance discussions with Koneczny.

59.    Through my participation in those discussions and coordination with Koneczny, I understood that Wandera received oral warnings followed by written warnings and an opportunity to improve before a PIP. Koneczny handled the formal disciplinary steps. I do not claim that I personally attended every warning, and I understand that the formal warning sequence should be established through Ferguson's records or testimony from a witness with direct knowledge.

60.    Donna Cox's investigation record reflects that she obtained information from or attributed to me, Rogers, and Nair. After reviewing the record produced in this litigation, I found no documented substantive interview in which Hicks responded to my allegations concerning differential treatment, heightened documentation requirements, inaccurate summaries, or her participation in the PIP process.

61.    Cox's notes also recorded that I reported the I-140 hold and explained that the immigration matter was time-sensitive. The investigation record further reflects that Cox asked Harrison Rogers when the PIP process had first been planned, but the record does not document a responsive answer identifying that timing. I was never informed that Cox interviewed the person

11

who made the I-140 decision, anyone responsible for Ferguson's immigration process, or Hicks concerning the hold, and I was never provided a specific finding addressing it.

62.     During my December 10, 2024 follow-up meeting with Cox, she told me that Nair and Rogers had stated that no managers' names were tied to the restructuring plan and that some of the feedback had been unsolicited. I disagreed because the restructuring materials I had seen identified managers and team assignments, and because Rogers had previously told me that 360-degree feedback had been requested. I documented those contradictions in my December 10 and December 11 communications, which are included in **Plaintiff's Exhibit 11**. I did not see Cox's internal email or investigation notes while I was employed by Ferguson; I first saw those materials after Ferguson filed them with its summary-judgment motion. Cox did not provide me with a substantive response to the questions and contradictions I identified in those communications.

63.     Beginning in approximately October and November 2024, I experienced significant anxiety, panic symptoms, sleep disruption, crying, difficulty concentrating, and fear concerning my employment and immigration status.

64.     On or about November 12, 2024, and on other occasions during the disputed performance process, I called Ferguson's mental-health support service because I was experiencing workplace-related stress, anxiety, and panic symptoms. I described my symptoms and was advised to seek medical care. I do not possess a written record of those calls. Ferguson's own investigation notes record my report of those calls during my November 15, 2024 interview.

65.     On November 21, 2024, I sought medical treatment for anxiety and panic attacks and received prescription medication. The relevant primary-care record is filed as **Pl. Ex. 25**.

66.     My symptoms continued while I remained employed and attempted to comply with the PIP. I continued to receive medical treatment for these symptoms while employed. Additional treatment records exist and can be produced to the Court if it wishes to review them.

12

67.     I began seeking alternative employment in December 2024 because Ferguson had placed me on a PIP, my I-140 process had been placed on hold, and my internal complaints had not resulted in relief.

68.     Based on those circumstances, I became concerned about the security of my employment and immigration status.

69.     HTC Global Services extended a written offer to me on January 28, 2025, and I accepted it on January 29, 2025. The offer identified an anticipated start date of February 24, 2025 and an annualized base salary of $130,000.

70.     The $130,000 amount reflected base salary. My Ferguson compensation included an annual bonus opportunity, while the HTC offer identified base salary and listed employment benefits but did not identify an annual bonus.

71.     Ferguson terminated my employment on February 11, 2025.

72.     Ferguson did not know about the HTC offer when it terminated my employment.

73.     I dispute that I refused feedback, failed to participate in the PIP, or was given more than two meaningful months to improve.

74.     During the November 22, 2024 meeting with Michelle Hicks and Adam Feldberg, I was shown limited feedback details, but the identities of the individuals who had submitted the feedback were not disclosed to me. I was not provided the complete written submissions from Julie Hedly, Linda Ware, Ginger Dowdy, Stephanie Goldberg, Michelle Hicks, the anonymous submitter, or Andrew Lautenslager during my employment. I first saw the complete submissions, including the submitters' identities and the full Workday feedback exports, when Ferguson produced and relied on them in this litigation. I later observed that the Workday exports contain a column titled "Confidential: Not Shared with Feedback Recipient." That column is marked "Yes" for each of those seven submissions, including Julie Hedly's favorable feedback described in

13

paragraph 7 above. It is marked "No" only for Dianne Diggs's September 26, 2024 submission, which was the one written submission I was able to see in Workday during my employment and about which I sought clarification at the time.

75.    Donna Cox interviewed me on November 15, 2024. During Donna Cox's investigation, I identified Linda Ware, Michelle Hicks, Dianne Diggs, Arfas Sait, Indu Philip, and UST Global as individuals or entities with whom I had experienced prior professional challenges that were known to Nair. At that time, I had not been shown the complete set of written feedback submissions or all of the submitters' identities. I later learned through Ferguson's litigation production that several of the individuals or entities I had identified had in fact provided feedback, including Linda Ware, Michelle Hicks, Dianne Diggs, and UST personnel. I do not claim that Arfas Sait or Indu Philip submitted feedback unless Ferguson's records establish that they did.

76.    The PIP stated a plan period of November 21, 2024 through February 18, 2025. Hicks's December 6 entry stated that she viewed the PIP as delayed because of my request to become an individual contributor and adjusted training deadlines to January 15 and January 20, 2025. My December 9 comment stated that I was committed to delivering my best, would complete assigned training by the due dates, and was awaiting answers to specific clarification questions.

77.    Ferguson terminated me on February 11, 2025, before the plan's stated February 18 end date. I was not provided a final end-of-plan evaluation measuring my performance against all of the plan's stated objectives.

I declare under penalty of perjury that the foregoing is true and correct.  Executed on July 31, 2026.

*Manimegalai Loganathan*
Manimegalai Loganathan (Jul 31, 2026 17:13:13 EDT)

Manimegalai Loganathan

14