**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**NEWPORT NEWS DIVISION**

| | |
|---|---|
| MANIMEGALAI LOGANATHAN,<br><br>Plaintiff,<br><br>vs.<br><br>FERGUSON ENTERPRISES LLC,<br><br>Defendant. | Case No.: 4:25-cv-120 (JKW) (RJK)<br><br>**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** |

Plaintiff Manimegalai Loganathan ("Plaintiff" or "Loganathan"), by and through her undersigned counsel, Sage Legal LLC, hereby respectfully submits this Memorandum of Law in Opposition to Defendant Ferguson Enterprises LLC's ("Defendant" or "Ferguson") Motion for Summary Judgment.  For the reasons set forth below, Defendant's motion should be denied.

## PRELIMINARY STATEMENT

Ferguson's motion presents a credibility contest as though it were an undisputed record; it asks the Court to convert a sharply disputed employment discrimination and retaliation claim into undisputed "poor performance" to obtain summary judgment and avoid a trial.  The Federal Rules of Civil Procedure (hereinafter referred to as "Rules" or "Rule") does not permit that result. On October 2, 2024 – weeks before Ferguson's contrived disciplinary record –the Defendant rated Manimegalai Loganathan "Effective" in her first partial year *as a manager*. Its records praised her initiative, accountability, technical acumen, relationship-building, and progress in an unusually broad assignment. It awarded her a performance-based merit increase, a separate 14.80% base-salary adjustment, an above-target bonus, and, on December 5, 2024 *a Gold Award*.

Yet Ferguson now characterizes essentially the same period as persistent managerial failure warranting a performance improvement plan ("PIP") and termination. Under guiding Fourth Circuit precedent,[1] that conflict is a jury question, not a basis for summary judgment.

This chronology alone creates triable issues of fact for a jury to decide this case. Among other things, Loganathan complained directly to Rajat Nair ("Nair") that she was paid materially less than a manager with the same title and supervisor.

---

[1] See Sempowich v. Tactile Systems Technology, Inc., 19 F.4th 643 (4th Cir. 2021); see also Wannamaker-Amos v. Purem Novi, Inc., 126 F.4th 244 (4th Cir. 2025).

Plaintiff specifically testified Nair answered that her pay could not match American workers because she was Indian[2] and on a visa and that she had to work twice as hard.

In late October 2024, she reported discrimination and retaliation to Vice President Harrison Rogers. Ferguson's evidence shows only that a potential PIP was being *discussed* on October 28, 2024; not that a final decision had been made, by whom, or before which conversation. Nair then wrote on October 29, 2024 that she was "the wrong person for any role in Ferguson," requested additional feedback, and obtained submissions dated October 30, October 31, and November 1 in 2024. Rogers told Ferguson's investigator that the "official PIP" followed that "additional feedback."[3] A jury may therefore find that the process remained contingent and materially changed after Plaintiff's complaint.

The PIP record also differs from Ferguson's characterization. The document bears a nominal November 21 start date, but Hicks did not enter it into Workday until December 6 and Loganathan did not acknowledge it until December 9.[4] Every "previous discussion or counseling" identified in the PIP occurred after the late-October complaint.[5] The PIP relied heavily on unattributed or confidential feedback that had not been shared with Loganathan; required broad documentation, architectural diagrams, recurring reviews, and trainings; and demanded immediate improvement during a period containing scheduled training, holidays, approved leave, and illness.

Ferguson terminated her on February 11, 2025 one week before the stated February 18 end date.[6] Ferguson's filed evidence does not identify the actual termination decisionmaker or a contemporaneous end-of-PIP assessment. Instead, it relies on Nair, who admits he ceased supervising Loganathan on October 31, to declare summarily that "Ferguson" saw insufficient improvement.[7]

---

[2] Notably, and as addressed further *infra*, this comment was directed at both her national origin and her race.

[3] Def. Ex. 12 at FERGUSON-0000485.

[4] Def. Ex. 23 at FERGUSON-0000277.

[5] Id. at FERGUSON-0000281.

[6] Loganathan Decl. ¶¶ 40–45, 59.

[7] Def. Ex. 1 ¶¶ 10, 28.

The claim concerning discrimination in compensation is independently trial-worthy. Ferguson's Workday record identifies a monthly range of $7,568.91–$10,408.34–$13,247.76 for Loganathan's position.[8] Her December 2023 promotion salary of $8,830.62 per month was approximately fifteen percent (15%) below the stated midpoint. Ten months later, Ferguson separately applied a 2.8% merit increase and a 14.80% "Additional Adjustment," bringing her to $10,422.24.[9] The adjustment reduced but did not eliminate the disparity with Chen Liang, who – according to Loganathan's sworn testimony – held the same title, worked in the same department, reported to Nair, and received approximately $150,000 in base salary. Nair's alleged statement expressly explaining the disparity creates a credibility dispute that cannot be resolved by choosing his denial over Loganathan's testimony.

Ferguson's motion repeatedly asks the Court to credit management's account, discount Loganathan's sworn evidence as "self-serving," and infer that every request for particulars reflected resistance rather than an effort to comply. Controlling law requires the opposite approach. A declaration or deposition based on personal knowledge is competent Rule 56 evidence; conflicts between it and an opposing declaration are for the factfinder unless the testimony is conclusively contradicted by the record.[10] Because the record supports competing inferences on performance, discriminatory intent, protected opposition, timing, causation, and pretext, the motion should be denied.

## PLAINTIFF'S RESPONSE TO DEFENDANT'S STATEMENT OF UNDISPUTED FACTS

### A.    As to "Background on Parties."

1.    Ferguson is the largest distributor of plumbing supplies, pipes, valves, fittings, waterworks, and fire and fabrication products in the United States. **Ex. 1**, Declaration of Rajat Nair ("Nair Decl.") ¶ 7.

**Response: Undisputed.**

---

[8] Def. Ex. 3 at FERGUSON-0000037.

[9] Def. Ex. 15 at P26; Def. Ex. 3 at FERGUSON-0000038.

[10] See Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 150-51 (2000).

2. Ferguson maintains an EEO and Harassment Prevention Policy that prohibits discrimination because of any protected characteristic, including race and national origin, and prohibits retaliation based on legally protected activity. **Ex. 2**.

**Response: Undisputed, but deny any inference that the policy's existence establishes that Ferguson enforced it in this case. <u>See</u> Responses 30-50 herein; <u>see</u> <u>also</u> Def. Ex. 2 at FERGUSON-0000113–114; Def. Ex. 11, Supplemental Response to Interrogatory No. 2; <u>Loganathan Decl.</u> ¶ 37; Loganathan Dep. 192:22-24 ("Ferguson policy, yes, that exists on paper, but in reality that failed me. [...] I have raised two EEO tickets in Ferguson portal").**

3. Ferguson hired Loganathan on July 2, 2018, as an IT QA Analyst III assigned to its headquarters in Newport News, VA. **Ex. 3** at FERGUSON-0000029. She later moved to a Business Systems Analyst position. Nair Decl. ¶ 8. Loganathan worked on Ferguson's backend engineering team, supporting Ferguson's software delivery lifecycle. Nair Decl. ¶ 8.

**Response: Undisputed, but note that Ferguson promoted Loganathan four times, culminating in her promotion to Manager – Software Engineering effective December 1, 2023. <u>See</u> <u>Loganathan Decl.</u> ¶¶ 5, 11. <u>See</u> Def. Ex. 3 at FERGUSON-0000029; Def. Ex. 1, Nair Decl. ¶¶ 8, 11–12; Plaintiff's EEOC Rebuttal at pp. 6–7. Loganathan Dep. 68:6-7; 69:6-9; 134:19-22; 135:23-25.**

4. Loganathan is an immigrant from India, who initially worked for Ferguson on an F-1 student visa. See Nair Decl. ¶ 9; **Ex. 4** at 65:24–66:6, 133:25–134:5. Ferguson then sponsored her H-1B visa application and assisted her in the process of applying for permanent residency and Permanent Labor Certification with the United States Department of Labor. Nair Decl. ¶ 9.

**Response: Undisputed that Plaintiff is from India, worked in F-1 and later H-1B status, and that Ferguson sponsored immigration processing, including PERM. <u>See</u> Def. Ex. 1, Nair Decl. ¶ 9; Def. Ex. 4 at 65:24–66:6; Def. Ex. 24 at FERGUSON-0000471–72; <u>Loganathan Decl.</u> ¶¶ 15-18; Loganathan Dep. 44:11-45:8 (from Belur, Tamil Nadu, India, with exclusively Indian citizenship); 66:1-6; 118:14-119:2.**

5. As an individual contributor between July 2018 and November 2023, Loganathan was an effective performer and received "Effective" or "Highly Effective" performance reviews

in her annual reviews, which respectively equate to a three or a four on Ferguson's five-point employee rating scale. **Ex. 3** at FERGUSON-0000060; Nair Decl. ¶ 11.

**Response: Undisputed. See Def. Ex. 3 at FERGUSON-0000060 and related Workday performance records; Def. Ex. 1, Nair Decl. ¶ 11; Def. Ex. 15, FY24 Compensation Statement; Pl. Ex. 2, FY24 Performance Review.**

> **B.     As to "Loganathan's Promotion to Managerial Role and Performance Issues."**

6.     On December 1, 2023, Plaintiff was promoted to the role of Manager – Software Engineering, in which she was assigned to supervise multiple teams supporting Ferguson's shared services software. Nair Decl. ¶ 12; **Ex. 3** at FERGUSON-0000029.

**Response: Undisputed. See Def. Ex. 1, Nair Decl. ¶ 12; Def. Ex. 3 at FERGUSON-0000029; Loganathan Decl. ¶¶ 5, 8; Loganathan Dep. 136:20-23.**

7.     Loganathan struggled from the outset with her managerial role in her new position. In Loganathan's February 2024 Midyear Performance Checkpoint evaluation, Nair noted that Loganathan has been "immersed in learning about the new teams and engaging with business stakeholders" and "has focused on familiarizing herself with the expanded scope of responsibilities and building relationships with key stakeholders," but noted that she needed to work on "Relationship Building," "Communication Skills and Emotional Intelligence," and a "Skillset Ramp-Up" to become "a proficient technical manager." **Ex. 5**.

**Response: Disputed. The February 2024 checkpoint identified developmental areas after approximately two (2) months in the role; it did not rate Plaintiff ineffective, state that her job was at risk, or recommend a PIP. See Def. Ex. 5, February 2024 Midyear Performance Checkpoint; Def. Ex. 19, FY24 Annual Review; Def. Ex. 15, FY24 Compensation Statement. Ferguson later rated her FY2024 performance "Effective" and awarded performance-linked compensation and recognition. See Pl. Ex. 2, FY24 Performance Review.**

8.     Beginning in June 2024, in connection with her then-forthcoming annual evaluation, Ferguson solicited feedback from her colleagues, including peers, supervisors, and direct reports, on Loganathan's performance in her new role. Nair Decl. ¶ 13; **Ex. 6**. One Ferguson associate submitted feedback on Loganathan unprompted. Nair Decl. ¶ 13.

**Response: Undisputed that Ferguson began collecting feedback in June 2024. Disputed that all feedback later relied upon was part of the same annual-review process; for example, the record reflects feedback dated September 26, October 30, October 31, and November 1, including vendor feedback supplied "as requested." See Def. Ex. 6 at FERGUSON-0000462– 65, including Julie Hedly's June 12, 2024 feedback and other June–September feedback; Def. Ex. 9, feedback dated October 31 and November 1, 2024; Def. Ex. 20, vendor feedback dated October 30, 2024 stating it was supplied "[a]s requested"; Def. Ex. 8, Nair's October 29 communication. Dispute the validity of this feedback, as these were pretextual and indicative of discrimination.**

9.     Loganathan received some positive feedback, but also received extensive constructive criticism, including the following:

- "Mani should take into consideration that some of her team members have experience in their respective areas that she does not. Because of that, she should trust their recommendations and not attempt to assert herself when she doesn't have the same knowledge/skill set to support decisions and directions. Being kept informed is one thing, trying to steer the (wrong) direction is another. Mani should also evaluate the role and duties/responsibilities of those reporting to her. All roles cannot be managed the same. Some roles are self-managing and too much involvement begins to feel like micromanagement." Linda Ware, June 13, 2024.

- ". . . Mani should consider taking more initiative to seek out opportunities to lean in on our current challenges/opportunities. I would like to see Mani be more proactive when we have issues, and be more aware of the work in the space, the issues her team is working on, and what is happening to resolve them." Stephanie Goldberg, June 24, 2024.

- "Mani tends to interrupt people when on calls but has improved on this recently. On calls she sometimes doesn't understand the issue at hand and tries to solution on a meeting that is an update meeting. She also has had some issues with my BSAs it seems to spawn from one thing they don't do that initiates a discussion with Rajat and not myself. I think she is still finding her way as a manager and jumps to conclusions about work and people. She also doesn't follow the hierarchy in our group. Prior to reaching out to my team or Rajat she should reach out to me and give me a chance to fix the situation if it needs fixing. I've found there isn't a big enough issue for some of the issues that have been brought up." Michelle Hicks, July 3, 2024.

- "If there is an issue Mani is quick to point the finger at someone instead of trying to help find a solution. When the teams are quickly trying to resolve an issue with another team and need to loop in L3 or request their assistance she will start questioning why we didn't notify them in advance and follow the correct process. Sometimes if there is a high priority issue we need to act quickly and do not always have advance notice. This makes our team look bad in front of other teams and its embarrassing to the teams working to resolve the issue. Being flexible goes a long way. Instead of trying to help resolve an issue she is quick to say that that is not her role it is a BSA, PO or Team Lead role. When its an issue we should all try to pitch in to get it resolved no matter what role you are in. Time is lost when we wait for others to resolve something that we have the knowledge to help resolve ourselves." Dianne Diggs, September 26, 2024.

6

Ex. 6.

**Response: Undisputed that such constructive criticism was given, but dispute that the existence of such criticism establishes an undisputed fact that Plaintiff had subpar job performance. Note that the Exhibit contains substantial positive feedback as well, which should be given greater weight and credibility.** See **Def. Ex. 6 ("She shows a remarkable level of responsibility and dependability," Dianne Diggs, September 26, 2024; "She takes the initiative to solve issues, […]. She does well with follow through and tasks that need to be completed," Michelle Hicks, July 3, 2024; "has improved […] recently," Michelle Hicks, July 3, 2024; "Mani brings her technical acumen to her current role and leans in when available to help with issues. She is pleasant to work with and I look forward to seeing her grow into her role as working technical lead, growing her team and growing as a leader in her space," Stephanie Goldberg, June 25, 2024; "she continues to embrace feedback with an open attitude," Stephanie Goldberg, June 25, 2024; "she is performing admirably. […] She is presently in the phase of building relationships in her managerial role, focusing on establishing trust with her team members and grasping the wider scope of their roles within the IT department. Feedback from team members indicates she has excelled in this area. It's important to continue listening to her reports, even if it seems no immediate action can be taken on the issues. She has seamlessly taken on the management […] and is proactively tackling process issues […], demonstrating her commitment to the team. She is successfully leading the integration of service construction and the modernization of our processes. Her expertise in operational relationships and CI/CD processes is vital for the development of our services. […] Mani has made significant progress in her tenure. She has proven to be a valuable member of the team, and I am confident that with time, she will become the driving force behind our push towards modernization," Julie Hedly, June 12, 2024; "Mani was given a vast amount of responsibility […], presenting unique challenges that demand more from her [compared to typical Java development teams]. She overseas associates handling four distinct system areas, showcasing her adaptability and commitment to mastering our**

processes," Julie Hedly, June 12, 2024). **Moreover, dispute the validity of any negative feedback, as pretextual and indicative of discrimination.**

10.    Other Ferguson colleagues and vendors submitted additional feedback in fall 2024 and raised concerns about Loganathan's management and performance, including repeated interruptions during meetings, dismissive communications, and unconstructive remarks that negatively impacted team morale. *See* **Ex. 7**.

**Response: Undisputed that such feedback exists, but dispute to the extent Defendant characterizes the concerns as longstanding or as having informed Plaintiff's October 2, 2024 performance review. The submissions dated October 30, October 31, and November 1 postdated both that review and Plaintiff's asserted October 28 complaint. <u>See</u> Def. Ex. 8, Nair's October 29, 2024 communication concerning a potential PIP and stating Plaintiff was "the wrong person for any role in Ferguson"; Def. Ex. 20 at FERGUSON-0000496–97, UST Global feedback dated October 30, 2024 and supplied "[a]s requested"; Def. Ex. 9 at FERGUSON-0000436–39, anonymous feedback dated October 31, 2024 and Andrew Lautenslager feedback dated November 1, 2024; Def. Ex. 18 at P119–20.  Moreover, dispute the validity of any negative feedback, as pretextual and indicative of discrimination.**

11.    Managers noted that Loganathan was not receptive to this negative feedback, and these managers indicated that rather than accepting the feedback as an opportunity to improve, Loganathan would often push back on or fail to incorporate the feedback. *See* **Ex. 8**; **Ex. 9** (A. Lautenslager feedback); Nair Decl. ¶ 15.

**Response: Disputed. Plaintiff repeatedly requested the underlying feedback, specific incidents, dates, unmet expectations, and measurable standards; stated in writing that she welcomed feedback and was committed to improving; participated in meetings; acknowledged the PIP; and began assigned training. <u>See</u> Def. Ex. 21 at P69–71, including Plaintiff's request to identify the performance concerns so she could address them effectively; Def. Ex. 22 at P47–50, including Plaintiff's repeated requests for specific examples, dates, expectations, and the basis for the PIP ("Understanding the details— such as examples of performance concerns, expectations not met, or behaviors requiring improvement—is crucial for me to take meaningful corrective actions," as well as Plaintiff's**

noting that "my questions were not fully addressed"); **Def. Ex. 29 at P77–81, including Plaintiff's statement that she was "committed to improving" and "welcome[d] feedback," and that one question remained partially answered, while others were not addressed at all ("I am following up on my earlier requests for detailed clarification regarding my placement on the Performance Improvement Plan (PIP). I want to better understand the specific reasons and expectations associated with this decision to ensure I can fully address any concerns and succeed in meeting the outlined objectives"; "you advised me to view the PIP as a positive opportunity for improvement but did not address my specific concerns/questions"); Def. Ex. 23 at FERGUSON-0000277–83, Plaintiff's PIP comments and acknowledgment ("Prior to being placed on the PIP, I was not informed of any performance issues, either orally or in writing, which is inconsistent with the general Ferguson PIP policy followed for other employees"; "Could you please provide more detailed explanations for each point mentioned?"). Moreover, dispute the validity of any negative feedback, as pretextual and indicative of discrimination.**

C.     As to "Loganathan's Compensation in Her Manager Role."

12.     Upon her promotion on December 1, 2023, Loganathan's monthly salary increased from $8,027.91 to $8,830.62. **Ex. 3** at FERGUSON-0000037–38.

**Response: Undisputed that Plaintiff's monthly salary increased, but note that Plaintiff's separate claim concerns whether the amount was set on a discriminatory basis, not whether an increase occurred. <u>See</u> Loganathan Dep. 156:24-157:9 (noting that, during that same time, another manager of software engineering, Chen Liang, who was managing a team of half Loganathan's size, was awarded $12,500); Def. Ex. 11, Supplemental Response to Interrogatory No. 20.**

13.     This was within the salary range for her position of $7,568.91–$13,247.76. *Id.* at FERGUSON-0000037.

**Response: Undisputed, but dispute that this establishes that her salary was set without discriminatory motive. <u>See</u> Def. Ex. 10, Plaintiff's acceptance communication noting that the salary appeared aligned with the lower end of the range; Def. Ex. 11, Supplemental Response to Interrogatory No. 20.**

14.     She also became eligible for a bonus plan with a target 15% annual bonus. *Id.* at FERGUSON-0000038.

**Response: Undisputed, but note that Plaintiff's actual FY2024 bonus was 17.05% of eligible earnings. <u>See</u> Def. Ex. 15, FY24 Compensation Statement (15% target and an actual bonus paid at 17.05% of eligible earnings).**

15.     When Loganathan initially accepted the position, she wrote that she was "thrilled" to accept it but was concerned with the fact that the compensation "appears to align with the lower end of the salary range mentioned in the job description." **Ex. 10**. She asked if Ferguson could "revisit and assess my performance after six months with the potential for a salary increase." *Id.*

**Response: Undisputed. <u>See</u> Def. Ex. 11, Supplemental Responses to Interrogatory Nos. 2, 19, and 20; Plaintiff's EEOC Rebuttal at pp. 8–9 ("You will not be getting the same pay as American workers because you are an Indian and on a visa").**

16.     Loganathan later claimed to the EEOC and in this lawsuit that Nair told her during this time that she would "not be getting the same pay as American workers because you are an Indian and on a visa." **Ex. 11** at Supp. Resps. to Inter. Nos. 2. However, Loganathan has no contemporaneous documentation of this alleged statement, and it was not mentioned in her human resources complaint or the subsequent investigation, nor in the demand letter her attorney sent to Ferguson's legal department in January 2025. *See* **Ex. 12**; **Ex. 13**.

**Response: Disputed. <u>See</u> Plaintiff's EEOC Rebuttal at p. 8 ("You will not be getting the same pay as American workers because you are an Indian and on a visa"); Def. Ex. 11, Supplemental Responses to Interrogatory Nos. 2, 19, and 20; <u>Loganathan Decl.</u> ¶¶ 20, 22, 23, 32. Moreover, object as inadmissible under FRE 408.**

17.     Just over a month after receiving the promotion, Loganathan complained that her take home pay after taxes was lower than she expected. **Ex. 14**.

**Response: Undisputed, but dispute that this is relevant to her claims in this case.**

18.     Her wages during this time reflected that for a period of time after her visa transition, Ferguson had erroneously not been deducting certain taxes from her salary, such that her prior take home pay did not reflect the full required tax deductions. *See id.*

**Response: Undisputed, but object to relevance and materiality.**

19.    Ferguson fixed this issue once discovered but did not require Loganathan to refund any overpayment. Nair Decl. ¶ 22.

**Response: Undisputed that Ferguson did not seek direct repayment from Plaintiff, but Plaintiff lacks personal knowledge sufficient to admit or deny whether Ferguson corrected the issue with the relevant tax authorities.**

20.    Nair inquired into whether Loganathan's salary could be further increased to address this issue, but second level supervisor Harrison Rogers confirmed that Ferguson does not "true[] up [employees' salaries] to offset the taxes [employees] owe." He noted, though, that Loganathan's compensation could continue to grow commensurate with her skillset and contributions. **Ex. 14**.

**Response: Undisputed that Nair inquired about an increase and Rogers responded that Ferguson would not increase salary solely to offset taxes, but object to relevance and materiality, as this is inconsequential to the issue of whether Plaintiff's initial salary-setting was rooted in discrimination based on Nair's comments.**

21.    In July 2024, Loganathan complained that an external hire who lived in another region was offered a higher salary to perform a managerial function. *See* **Ex. 4** at 156:24–161:3.

**Response: Undisputed.**

22.    The identified associate was an external hire, had more extensive professional and management experience than Loganathan, held a platform and infrastructure role (rather than the development role Loganathan held), and was in a different geographical market. Nair Decl. ¶ 24.

**Response: Undisputed, but dispute that this negates discrimination; note that Plaintiff and Chen Liang shared the same job title, that Plaintiff managed a team twice the size of Liang, and that Plaintiff was on the hiring panel who interviewed Liang. <u>See</u> Loganathan Dep. 156:24–159:3. Thus, it remains in dispute whether Defendant's choice to pay Liang more was pretext for discrimination.**

23.    In October 2024, Ferguson awarded Loganathan a 17.6% base salary increase, raising her monthly salary to $10,422.24, which was above the median salary for her position. *See* **Ex. 15**; **Ex. 3** at FERGUSON-0000037–38.

11

**Response: Undisputed that Plaintiff received this salary increase. Plaintiff lacks personal knowledge sufficient to admit or deny whether this was above the median salary for her position. Dispute that this negates discrimination, but note that this further demonstrates Plaintiff's exceptional job performance. <u>See</u> Pl. Ex. 2, FY2024 Performance Review; Pl. Ex. 10, FY2024 Compensation Statement / Pay Structure stating that merit increases and annual bonuses are based on individual performance; Def. Ex. 3, Plaintiff's compensation history reflecting the October 2024 increase to $10,422.24 per month, FERGUSON-0000037-38; Def. Ex. 15, FY2024 Compensation Statement reflecting the 2.8% merit increase, 14.8% additional adjustment, and 17.05% annual bonus; Def. Ex. 19, FY2024 performance review reflecting an Effective rating, FERGUSON-0000004.**

      **D.**      **As to "Loganathan Requests Permission to Pursue Other Internal Positions."**

24.      On or around September 6, 2024, Loganathan contacted Nair seeking permission to apply for an internal Ferguson position with a different group. **Ex. 16**; Nair Decl. ¶ 17.[11]

**Response: Undisputed. <u>See</u> Def. Ex. 17, Plaintiff's contemporaneous documentation concerning Nair's declining availability and her September 7 decision to remain in the role; Def. Ex. 4 at 204:6–205:3 and 177:11–179:7.**

25.      Before this point, Loganathan stated she "wanted to move" to a different position because she "felt [she did not] have transparency" and "found it difficult to manage [her] team." **Ex. 12** at FERGUSON0000484.

**Response: Undisputed, but note that these difficulties were due to the conduct of other team members, not due to her inability to perform the work. <u>See</u> Plaintiff's EEOC Rebuttal concerning the September 5–7, 2024 internal-transfer communications and lack of managerial support. pp. 20-21 ("I used the opportunity to raise concerns about ongoing retaliation and potential workplace discrimination after expressing my intent to transfer out of Mr. Nair's organization. I specifically informed Mr. Rogers that I believed adverse actions—including reduced communication, abrupt changes in reporting structure, and**

---

[11] At Ferguson, associates applying for internal opportunities are required to indicate in the application whether the associate's current manager approves of the transfer. Nair Decl. ¶ 16. [Footnote 2 in Defendants' Statement of Undisputed Facts].

exclusion from key meetings— were retaliatory in nature"); <u>Loganathan Decl.</u> ¶¶ 27, 31, 37; **Loganathan Dep. 142:16 ("I had to manage seven teams, 40-plus team members").**

26.    Later that day Loganathan sent a message to Nair asking "[s]hall I start exploring internal openings." He responded "Yep" and "[y]ou have my manager approval to proceed." **Ex. 16**.

**Response: Undisputed.**

27.    In her contemporaneous documentation of events, Loganathan expressed concern about Nair's "declining availability on September 6th" and "assumed he might be unhappy with my decision to explore other opportunities . . . ." **Ex. 17**. *See also* **Ex. 4** at 204:6–205:3.

**Response: Undisputed.**

28.    On the afternoon of September 6, 2024, Nair took his family pet to the vet, **Ex. 16**.

**Response: Undisputed, but object to relevance and materiality.**

29.    The next day (a Saturday), Loganathan "let [Nair] know that I would drop my plans to look elsewhere and continue in my current role." **Ex. 17**.

**Response: Undisputed, but note that Loganathan did so because she feared negative consequences. <u>Loganathan Decl.</u> ¶ 30; Loganathan Dep. 204:6-205:3 (describing "the sudden change in his behavior," wherein "his availability also got reduced"); 175:1-25 ("his availability continued to decline").**

30.    On October 28, 2024, Loganathan contacted Nair's supervisor, Harrison Rogers, to schedule a call to discuss "some challenges and work" and to get his "guidance to navigate these challenging times." **Ex. 18**.

**Response: Undisputed, but note that these challenges were due to the discrimination and retaliation Plaintiff was experiencing. <u>See</u> Def. Ex. 18; Def. Ex. 11, Supplemental Response to Interrogatory No. 2; <u>Loganathan Decl.</u> ¶¶ 31-32; Loganathan Dep. 210:17-25.**

31.    According to Loganathan, three days later she informed Rogers that "after [she] expressed [sic] in applying for internal roles on 09/06, I have noticed significant changes in Rajat's availability and communication, as well as some intimidating behavior, accompanied by a reduction in my responsibilities," that such instances have "created considerable mental pressure," and that she was concerned that "considering these circumstances, this situation may be perceived

as retaliation or harassment." *Id.* at P119. Loganathan did not attribute Nair's conduct to her race, national origin, or any other protected classification or activity. *See id.*; E**x. 12**; **Ex. 4** at 177:11–179:7, 234:15–25.

**Response: Undisputed, but dispute that the absence of the words "race" or "national origin" in a selected written excerpt conclusively establishes any absence of complaints concerning discrimination or retaliation. <u>See</u> Def. Ex. 18 at P119–P120; Def. Ex. 11, Supplemental Response to Interrogatory No. 2 ("The substance of Plaintiff's communications with Rajat Nair was Plaintiff's complaint that she was not being paid the same as her colleagues, to which Nair stated it was due to her national origin and citizenship status"); <u>Loganathan Decl.</u> ¶¶ 20, 22-23, 29, 32; Loganathan Dep. 204:6-205:3 (describing "the sudden change in his behavior," wherein "his availability also got reduced"); 175:1-25 ("his availability continued to decline").**

32.    In an October 31, 2024 meeting with Rogers and Nair, Loganathan claimed she "felt retaliation and work place harassment." Thereafter, Rogers escalated these concerns to Ferguson's human resources department. **Ex. 17**. Once again, Loganathan did not attribute this "retaliation" and "harassment" to her race, national origin, or other classification or engagement in activity protected by Title VII or the VHRA. *See id.*; **Ex. 12**; Nair Decl. ¶ 21.

**Response: Undisputed, but dispute that the absence of the words "race" or "national origin" in a selected written excerpt conclusively establishes any absence of complaints concerning discrimination or retaliation. <u>See</u> Pl. Ex. 14.**

> E.    **As to "After Numerous Documented Performance Deficiencies, Loganathan was Placed on a PIP."**

33.    In Plaintiff's 2024 annual review, issued by Nair on October 2, 2024, Loganathan received an "Effective Performance" rating, a three on a five-point scale. **Ex. 19**.

**Response: Undisputed, but dispute the significance of this rating, given that other annual reviews included "Highly Effective Performance" ratings (a four on the five-point scale). <u>See</u> Def. Ex. 19, FY2024 Annual Review; Pl. Ex. 2, FY2019–FY2024 historical performance reviews (FY2020, FY2022, and FY2023 Annual Review "Highly Effective Performance" rating); Def. Ex. 1, Nair Decl. ¶ 11.**

34.     However, this review also included extensive constructive feedback, and stated that she needed to continue to focus on the "Relationship Building," "Communication Skills," and "Skillset Ramp-Up," areas for improvement noted eight months earlier in her mid-year checkpoint evaluation. *Id.*; *see* **Ex. 5**.

**Response: Undisputed, but dispute that those comments alone establish job performance issues significant enough to warrant termination, as Plaintiff received positive comments as well. See Def. Ex. 19, FY2024 Annual Review ("Mani has continued to enhance her technical expertise and people management skills. She is proactive in identifying and addressing SDLC challenges, holding team members accountable. Her passion for achieving business outcomes has been crucial in delivering results ahead of schedule and with high quality. Stakeholders regard Mani as a valuable partner, trusting her ability to successfully drive our business outcomes to completion"); Pl. Ex. 2, historical performance reviews and FY2024 compensation information ("Mani has a very positive 'can do' attitude and has come a long way in becoming one of the best BSA's we have in Ferguson. She has been instrumental in building a model delivery team that constantly delivers quality products at the speed our stakeholders need, has kept leadership updated on delivery lifecycle related items and has shown a lot of improvement on time management"); Def. Ex. 15, FY2024 Compensation Statement; Def. Ex. 1 ¶ 11.**

35.     The 2024 review incorporated feedback from Loganathan's colleagues. Nair Decl. ¶ 18.

**Response: Undisputed, but dispute any implication that feedback dated October 30, October 31, or November 1 was incorporated into the October 2 review.**

36.     The review stated that Loganathan needed to work on the following areas:

- "**Building Trust with Associates**: With the recent reorganization and being relatively new to the role, it's important for Mani to build foundational trust with peers and direct reports. Establishing strong relationships and fostering a culture where healthy conflict is welcomed will be crucial for the year ahead."
- "**Embracing Continuous Learning**: Learning is an ongoing process. Building relationships with team members who excel in their areas and relying on their expertise while learning alongside them will be key to her development."
- "**Fostering Team Autonomy**: Aim to make the teams more autonomous, enabling them to execute efficiently and effectively on business outcomes with clearly defined SDLC goals."

- "**Ongoing Learning and Influential Leadership**: Continue to expand your perspectives through reading and growth. Mastering the art of influence is essential. Leadership should be based on respect and influence rather than just title, and developing these skills will enhance your ability to lead effectively."

**Ex. 19**.

**Response: Undisputed, but note that this appears within an overall "Effective" rating, which also features positive feedback, and was framed as development for the coming year. See Def. Ex. 19, FY2024 Annual Review at FERGUSON-0000002-3 ("Mani has continued to enhance her technical expertise and people management skills. She is proactive in identifying and addressing SDLC challenges, holding team members accountable. Her passion for achieving business outcomes has been crucial in delivering results ahead of schedule and with high quality. Stakeholders regard Mani as a valuable partner, trusting her ability to successfully drive our business outcomes to completion").**

37.    On October 29, 2024, Nair explained that Loganathan's review "attempted to address what she should do different based on the feedback received, with the aim being positivity and encouragement to change." He noted, though, that "as days and weeks go by things are deteriorating." **Ex. 8**. Nair expressed concerns about Loganathan's performance as a manager, including that "[t]he team feels alienated and targeted by her," that "she was in ways abusing her role as a manager," and that he and others experienced that she was not properly making changes based on coaching and feedback. *Id.* Nair noted that the previous day—October 28, 2024—he spoke with Michelle Hicks about a potential PIP and expressed that he believed Loganathan "is the wrong person for any role in Ferguson . . . ." *Id.*

**Response: Undisputed that such communication exists, but dispute the underlying accusations as true. Dispute the validity of this feedback, as these were pretextual and indicative of discrimination, especially in light of Nair's prior approval to have Plaintiff switch to an individual role. See SMF ¶ 26, *supra*.**

38.    Additional feedback on Loganathan was later received from others; it described issues such as "[r]epeated instances of interruption during discussions, often due to lack of clear understanding of the topic," communication issues, difficulty accepting constructive feedback, and inadequate understanding of technical requirements and approaches. *See* **Ex. 20**; **Ex. 9**.

16

**Response: Undisputed that Ferguson received such feedback, but dispute that the accuracy and weight of such feedback was significant enough to warrant termination, as Plaintiff received positive feedback as well. See Def. Ex. 19, FY2024 Annual Review ("Mani has continued to enhance her technical expertise and people management skills. She is proactive in identifying and addressing SDLC challenges, holding team members accountable. Her passion for achieving business outcomes has been crucial in delivering results ahead of schedule and with high quality. Stakeholders regard Mani as a valuable partner, trusting her ability to successfully drive our business outcomes to completion"); Pl. Ex. 2, FY2019– FY2024 historical performance reviews (FY2020, FY2022, and FY2023 Annual Review "Highly Effective Performance" rating); Pl. Ex. 4, June 2024 Spotlight Award ("Mani exemplifies a proactive leadership style, fostering a can-do attitude within her teams. She is a dedicated and versatile leader who actively engages in finding innovative, out-of-the-box solutions to tackle challenging demands, never hesitating to roll up her sleeves and support her teams. [...]"); Pl. Ex. 5, December 2024 Gold Award (Plaintiff recognized for impact). Dispute the validity of this feedback, as these were pretextual and indicative of discrimination.**

39.    In connection with an organizational restructuring, Michelle Hicks became Loganathan's manager on November 1, 2024. **Ex. 3** at FERGUSON-0000029; Nair Decl. ¶ 26.

**Response: Undisputed.**

40.    On November 5, 2024, Hicks and Loganathan met and discussed, among other topics, "feedback from multiple people from our group as well as outside of our group" and Hicks's desire to "create a plan that will provide you success towards where you need to be." **Ex. 21** at P71.

**Response: Undisputed, but dispute that the meeting provided the specific incidents, dates, unmet expectations, and measurable correction period Plaintiff repeatedly requested. See Def. Ex. 21 at P69–P71 (November 5–10 meeting notes and email exchange concerning the new documentation requirements and generalized feedback). Loganathan Decl. ¶¶ 39-41.**

41.    Loganathan confirmed that she was "good with the details" in Hicks's email. Id. at P. 70. On November 14, 2024, Loganathan was informed that she would be placed on a PIP. **Ex. 22** at P50.

**Response: Undisputed, but note that Plaintiff's statement was a mere acknowledgment of receipt of details, and was not an admission that the criticisms were accurate or that a PIP was warranted. See Loganathan Decl. ¶¶ 42-44.**

42.    Loganathan was placed on a PIP on November 21, 2024. The PIP highlighted the feedback she received and identified three areas for improvement: "Conduct/Teamwork," "Situational Awareness," and "Productivity." **Ex. 23**.

**Response: Undisputed that Plaintiff was placed on a PIP with those areas for improvement, but dispute that Plaintiff was formally placed on an operative Workday PIP on November 21. Hicks stated on December 6 that she had submitted the PIP and that Plaintiff should then be able to see it in Workday; Plaintiff acknowledged it December 9 (and asked for clarifications, further demonstrating her receptiveness to constructive criticism and dedication to improve notwithstanding Ferguson's unclear feedback); Plaintiff disputes Ferguson's characterization that she received more than two full months under a finalized, accessible plan. See Def. Ex. 23; Def. Ex. 27 at P101–P102; Loganathan Decl. ¶¶ 45-46; Loganathan Dep. 204:6-205:3 ("Q. Did you have meetings and did you periodically meet with Hicks [...] while you were on the PIP to discuss kind of how you were developing throughout the PIP process? A. I had one 30-day PIP review meeting with Michelle Hicks. [...] for 30-day window I was only evaluated for five days, and I was told I was not meeting the expectations. [...] I completed [...] all the trainings that were requested").**

F.    **As to "Loganathan Complains About Retaliation Based on Her Transfer Request."**

43.    Shortly after the decision was made to pursue a PIP, **Ex. 8**, and following the October 31, 2024 meeting between Loganathan, Nair, and Rogers, a human resources case was opened after Loganathan expressed that she felt like she was being harassed and retaliated against based on her outreach to Nair. *See* **Ex. 12**.

18

**Response: Undisputed that a human resources case was opened, but dispute any inference that an impartial investigation occurred therefrom. See Def. Ex. 17, Plaintiff's contemporaneous October 31 account ("He will open a HR case to investigate but HR not contacted me yet"); Def. Ex. 12, Ferguson investigation record; Loganathan Decl. ¶¶ 36–37; Loganathan Dep. 30:24-31:2.**

44.     Then, on November 12, 2024, Loganathan sent a lengthy email to Rogers in which she expressed concerns about Nair's "accountability, autonomy, and transparency, along with actions that seemed to undermine my leadership," expressed an interest in moving to a new role, and summarized her contributions in her managerial role. **Ex. 24**. Her email also mentioned potential "retaliation or harassment," but again her email included no claim that her treatment was based on race, national origin, or other protected classification or engagement in legally protected activity. *Id.* at Ferguson0000472.

**Response: Undisputed, but note that Plaintiff's omission of her protected classes in this email is irrelevant and immaterial to her claim that she was discriminated against on those bases. See Def. Ex. 24 at FERGUSON-0000471–72; Pl. Ex. 16; Loganathan Decl. ¶ 18.**

45.     On or about November 13, 2024, Loganathan submitted an "Associate Workplace or EEO Concerns" request through Ferguson's Human Resources portal, wherein she again explained that she "ha[d] been feeling micromanaged" and experienced stress after expressing interest in exploring new roles on September 6. *See* **Ex. 25**; **Ex. 26**.

**Response: Undisputed that Plaintiff filed an EEO concern on November 13 and a related submission on November 15, constituting protected activity. Note that implementation of the PIP process followed. See Pl. Ex. 14 ("Today 11/14 , I learned from Michelle Hicks that I will be put on a Performance Improvement Plan"); Loganathan Decl. ¶ 37; 239:10-19.**

46.     HR's investigation, which included interviews and input from Loganathan, concluded there was no evidence to substantiate Loganathan's claims. **Ex. 12**.

**Response: Undisputed that HR concluded Plaintiff's claims were unsubstantiated, but dispute the validity of this conclusion. See Def. Ex. 12 at FERGUSON-0000482–0000488 ("there was a shift in [Mani's] mentor/mentee relationship with [...] Rajat and she felt like it was harassment and retaliatory"; "she kept trying to talk to Rajat [...] and he wasn't**

available to speak to her. [...] She stated that was what made her feel like it was retaliation because he wouldn't make himself available to her"); <u>Loganathan Decl.</u> ¶¶ 37, 60-62, 64.

47.    The investigation report reflects no complaint based on or evidence of differential treatment on the basis of race or national origin. *See id.*

**Response: Undisputed, but note that Plaintiff's omission of her protected classes is irrelevant and immaterial to her claim that she was discriminated against on those bases.**

48.    In response to the PIP, Plaintiff commented that "I strongly believe that this action may be retaliatory in nature." **Ex. 23**. The asserted basis was that "[p]rior to being placed on the PIP, I was not informed of any performance issues, either orally or in writing, which is inconsistent with the general Ferguson PIP policy followed for other employees." *Id.*

**Response: Undisputed.**

G.    **As to "Loganathan is Terminated."**

49.    In or around December 2024, Plaintiff requested a transfer to an individual contributor position, but no openings existed at the time. **Ex. 27** at P101–102; Nair Decl. ¶ 27.

**Response: Undisputed. <u>See</u> <u>Loganathan Decl.</u> ¶ 46.**

50.    After more than two months on the PIP, Ferguson saw insufficient improvement on the documented performance issues and encountered Loganathan's continued resistance to accept feedback about her performance. Ferguson therefore terminated her employment on February 11, 2025. Nair Decl. ¶ 28.

**Response: Undisputed that Loganathan's employment was terminated. Dispute that she received more than two meaningful months under a finalized PIP, resisted feedback, or failed to improve. <u>See</u> Def. Ex. 23 (Plaintiff sought clarification on the PIP); Def. Ex. 27 at P101–P102; Pl. Ex. 19 (Plaintiff sought feedback and clarification on the PIP and expressed concerns about retaliatory nature); <u>Loganathan Decl.</u> ¶¶ 73, 53.**

51.    In December 2024, while the PIP was in its early stages, Loganathan applied for a position with HTC Global Services. **Ex. 4** at Tr. 78:2–14. Two weeks before her termination, on January 29, 2025, Loganathan accepted a job with HTC Global Services, for which she was offered a $130,000 annualized base salary, plus benefits. **Ex. 28**. This exceeded her $125,066.88

annualized base salary at Ferguson at the time of her termination. *See* **Ex. 15**. Loganathan's start date was set for February 24, 2025.

**Response: Undisputed. See Loganathan Decl. ¶¶ 69-72; Loganathan Dep. 243:11-14.**

> **H.    As to "Jeanine Wandera and Will Parks Were Differently Situated Than Plaintiff."**

52.    In her Amended Complaint, Plaintiff claims that "[u]nlike her colleagues, Will Park[s] and Jeanine Wandera, were given verbal and written warnings and allowed time to improve, despite ongoing performance issues. In contrast, Plaintiff was immediately placed on a PIP with no prior warning." Am. Compl., Dkt. No. 18 ¶ 24.

**Response: Undisputed. See Def. Ex. 11, Plaintiff's Supplemental Interrogatory Response No. 22; Pl. Ex. 21, Nair's written communication recommending a two-step coaching, written follow-up, and improvement process for Parks (rather than a PIP); Pl. Ex. 17, Ferguson's PIP Quick How To Guide; Loganathan Dep. 227:21-25 ("other employees like Will Parks and Jeanine Wandera, despite, one, they had multiple oral warnings, then written warnings, and only then Jeanine was considered for PIP. For me, I was not given that opportunity"); 195:17-21 ("They had a serious performance concern, but when they fire me, I was – despite having like four promotions in five eyars and the effective performance and then I was placed on the PIP").**

53.    The record, however, shows that Loganathan *did* receive performance feedback before she was placed on a PIP. *See* SOF ¶¶ 7, 9–11, 33–38, 40–41.

**Response: Undisputed that feedback was received before PIP, but dispute that such feedback constituted clear progressive discipline, notice that her job was at risk, or provided defined opportunity to correct identified conduct before formal PIP escalation. See Plaintiff's Responses to SOF ¶¶ 7, 9–11, 33–38, 40–41.**

54.    In discovery, Loganathan identified almost no facts supporting this claim, other than her assertions that: (1) for Parks, Nair recommended "a constructive conversation" and ensuring Parks followed feedback, and (2) Wandera received multiple oral warnings before being placed on a PIP. **Ex. 11** at Supp. Resp. to Inter. No. 22.

**Response: Dispute that Plaintiff identified "almost no facts." See Def. Ex. 11, Supplemental Response to Interrogatory No. 22; Pl. Ex. 21; Loganathan Decl. ¶¶ 57-58.**

55. Loganathan acknowledges that like her, Wandera was placed on a PIP. *Id.*[12]

**Response: Undisputed, but note that Wandera received oral warnings followed by written warnings and an opportunity to improve before a PIP. See Def. Ex. 1, Nair Decl. ¶¶ 30-31; Loganathan Decl. ¶ 59.**

56. Unlike Loganathan, both individuals were performing in individual contributor roles, rather than managerial roles. Neither exhibited performance concerns around personnel management. Nair Decl. ¶ 29.

**Response: Undisputed that Parks and Wandera performed different roles than Plaintiff. Dispute the extent of Plaintiff's alleged performance concerns, as those concerns were exaggerated and pretext for discrimination and retaliation. See Def. Ex. 19, FY2024 Annual Review ("Mani has continued to enhance her technical expertise and people management skills. She is proactive in identifying and addressing SDLC challenges, holding team members accountable. Her passion for achieving business outcomes has been crucial in delivering results ahead of schedule and with high quality. Stakeholders regard Mani as a valuable partner, trusting her ability to successfully drive our business outcomes to completion"); Pl. Ex. 2, FY2019–FY2024 historical performance reviews (FY2020, FY2022, and FY2023 Annual Review "Highly Effective Performance" rating); Pl. Ex. 4, June 2024 Spotlight Award ("Mani exemplifies a proactive leadership style, fostering a can-do attitude within her teams. She is a dedicated and versatile leader who actively engages in finding innovative, out-of-the-box solutions to tackle challenging demands, never hesitating to roll up her sleeves and support her teams. [...]"); Pl. Ex. 5, December 2024 Gold Award (Plaintiff recognized for impact).**

57. Instead, each exhibited performance concerns associated with technical performance aspects of their software development roles. Nair Decl. ¶ 29.

---

[12] Wandera was placed on a PIP and separated from employment during the PIP period. Nair Decl. ¶ 31. [Footnote 3 in Defendants' Statement of Undisputed Facts].

**Response: Undisputed that the concerns attributed to Parks and Wandera were primarily technical, while those attributed to Plaintiff included managerial and communication issues, but dispute the weight of this evidence given that the alleged concerns regarding Plaintiff were exaggerated and pretext for discrimination and retaliation, as evidenced by the plethora of positive feedback she received as well. See Def. Ex. 19, FY2024 Annual Review ("Mani has continued to enhance her technical expertise and people management skills. She is proactive in identifying and addressing SDLC challenges, holding team members accountable. Her passion for achieving business outcomes has been crucial in delivering results ahead of schedule and with high quality. Stakeholders regard Mani as a valuable partner, trusting her ability to successfully drive our business outcomes to completion"); Pl. Ex. 2, FY2019–FY2024 historical performance reviews (FY2020, FY2022, and FY2023 Annual Review "Highly Effective Performance" rating); Pl. Ex. 4, June 2024 Spotlight Award ("Mani exemplifies a proactive leadership style, fostering a can-do attitude within her teams. She is a dedicated and versatile leader who actively engages in finding innovative, out-of-the-box solutions to tackle challenging demands, never hesitating to roll up her sleeves and support her teams. [...]"); Pl. Ex. 5, December 2024 Gold Award (Plaintiff recognized for impact); Pl. Ex. 21; Loganathan Decl. ¶ 58.**

58.    Further, both Parks and Wandera were receptive to and attempted to incorporate performance feedback. Nair Decl. ¶ 30.

**Response: Plaintiff lacks personal knowledge sufficient to admit or deny Parks and Wandera's response to feedback, but dispute any implication that Plaintiff was unreceptive to feedback. See Pl. Ex. 13 (communication from Plaintiff seeking clarification on the PIP, including "I kindly request: 1. A detailed explanation of the reasons for placing me on the PIP. 2. Examples of specific instances or performance metrics that were not met"); Def. Exs. 21-23 and 29 (Plaintiff seeking clarification on feedback); Loganathan Decl. ¶ 57.**

59.    Loganathan claims that Ferguson violated its supposed "PIP Policy," referring to a "Quick How to Guide," which provides that "[g]eneral practice would be to begin with a verbal discussion or performance review then move to PIP if the associate fails to improve within a reasonable amount of time." *See* **Ex. 29** at P79–81.

23

**Response: Undisputed. See Pl. Ex. 17.**

60.     Loganathan does not identify any Ferguson policy that mandates verbal counseling or otherwise restricts Ferguson's discretion with regard to PIPs. *See id.* (relying on "[g]eneral practice" included in an internal "Quick How To Guide").

**Response: Undisputed, but this does not negate the retaliatory nature of the PIP. See Def. Ex. 29 at P79–P81; Pl. Exs. 17 (Plaintiff told on November 14 that she would be put on PIP; after reaching out to complain to Harrisson to complain about Rajat's harassment and retaliation, and after reporting Associate Workplace or EEO Concerns); Loganathan Decl. ¶¶ 40, 48.**

61.     Through its policies, Ferguson retains discretion to address performance issues, including with or without progressive discipline. *See* **Ex. 30** (Ferguson policy stating "the company need not resort to progressive discipline, but may take whatever action it deems necessary to address the issue at hand"). *See also* **Ex. 23** at FERGUSON-0000282–83 (Loganathan acknowledges that "I understand that progressive discipline is not required and the timeline above does not guarantee employment . . . .").

**Response: Undisputed, but disputed that this negates an inference of discrimination or retaliation. See Def. Ex. 29 at P79–P81 ("I was informed that my questions were irrelevant and that I should view the PIP as a positive opportunity, focusing on learning rather than understanding the reasons behind it. As an employee undergoing potential retaliation after raising concerns to higher management, I believe it is essential to understand the reasoning behind the PIP").**

## LEGAL STANDARD

Summary judgment is appropriate only if Ferguson shows that there is no genuine dispute as to any material fact and that it is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(a). The Court must view the evidence and draw all reasonable inferences in Loganathan's favor; it may not weigh evidence, resolve credibility, or choose among competing reasonable inferences. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 255 (1986). The Fourth Circuit has emphasized that summary judgment is not a mechanism for disposing of cases perceived as weak; the question is whether a rational jury could find for the nonmovant after the record is viewed

"'through a panoramic lens.'" See Wannamaker-Amos v. Purem Novi, Inc., 126 F.4th 244, 254 (4th Cir. 2025) (quoting DeMasters v. Carilion Clinic, 796 F.3d 409, 418 (4th Cir. 2015)).

Critically, under the "'mixed-motive'" framework for analyzing discrimination claims, "'[a] plaintiff can survive a motion for summary judgment by presenting direct or circumstantial evidence that raises a genuine issue of material fact as to whether an impermissible factor such as race [or national origin] motivated the employer's adverse employment decision.'" See Roy v. Guidehouse, Inc., No. 1:24-CV-183 (RDA) (WBP), 2026 WL 2110933, at *12 (E.D. Va. July 21, 2026) (citing Diamond v. Colonial Life & Acc. Ins. Co., 416 F.3d 310, 318 (4th Cir. 2005)). "'[T]he impermissible factor need not have been the sole factor.'" Id. "'As long as it motivated the adverse action, the plaintiff can establish an unlawful employment practice.'" Id.

Indeed, a plaintiff can adduce various forms of circumstantial evidence that undermine an employer's proffered rationale. See Wannamaker-Amos, 126 F.4th at 257. This may include evidence that the company's explanation was "inconsistent over time, false, or based on mistakes of fact," Haynes v. Waste Connections, Inc., 922 F.3d 219, 225 (4th Cir. 2019), or "[e]vidence that [the] company failed to follow its own disciplinary policies," Wannamaker-Amos, 126 F.4th at 260; see also Hollis v. Morgan State Univ., 153 F.4th 369, 383 (4th Cir. 2025).

It is crucial to remember that "[a] plaintiff does not need a 'smoking gun' to prove invidious intent, and few plaintiffs will have one." See Merritt v. Old Dominion Freight Line, Inc., 601 F.3d 289, 299–300 (4th Cir. 2010).

"Rather, '[c]ircumstantial evidence is not only sufficient, but may also be more certain, satisfying and persuasive than direct evidence.'" See Id. (citing Desert Palace, Inc. v. Costa, 539 U.S. 90, 100 (2003) (citation and internal quotations omitted)).

In employment cases, an employer's affidavit does not become conclusive merely because it labels criticism "performance;" favorable reviews, awards, compensation decisions, procedural irregularities, timing, and discriminatory comments are all evidence a jury may weigh against such criticism. See Sempowich, 19 F.4th at 649–53; see also Wannamaker-Amos, 126 F.4th at 255–62. As demonstrated below, the record is rife with such favorable praise of the Plaintiff. Moreover, Rule 56 also requires a declaration to be based on personal knowledge, set out admissible facts, and show competence to testify. See Fed. R. Civ. P. 56(c)(4). Nair may testify to events he

personally observed through October 31, 2024, but his conclusory assertion about what "Ferguson" saw after he ceased supervising Loganathan does not, without foundation, establish the identity, information, or reasoning of the later termination decisionmaker as undisputed fact.

## ARGUMENT

### A. Plaintiff Administratively Exhausted her Race Discrimination Claim

A Title VII suit ordinarily may encompass claims stated in the formal charge, claims reasonably related to them, and claims that a reasonable administrative investigation would have developed. See Sydnor v. Fairfax County, 681 F.3d 591, 594–95 (4th Cir. 2012); Chacko v. Patuxent Institution, 429 F.3d 505, 509 (4th Cir. 2005). The Fourth Circuit has recently confirmed that the formal charge controls. See Hoffman v. Inova Health Care Services, 169 F.4th 207, 219–20 (4th Cir. 2026). Here, unlike in Hoffman, the formal charge itself named Ferguson, checked national origin and retaliation, identified Loganathan as Indian, described the allegedly discriminatory pay statement, PIP, reassignment of duties, immigration hold, and discharge, and alleged that those acts were because she was Indian and in retaliation for her complaints. Def. Ex. 31. Those national-origin and retaliation claims are properly exhausted.

The charge admittedly did not check the separate "race" box. Loganathan preserves the argument that the narrative allegations concerning her Indian ancestry and the same actors, dates, compensation decision, PIP, and termination are sufficiently intertwined that an investigation would not rationally separate race from national origin. See Sydnor, 681 F.3d at 595 (charge and complaint need not be "precisely the same"). Indeed, Plaintiff's identity as an Indian is as much related to her race as it is to her national origin. In such circumstances, courts have routinely found race discrimination claims to encompass national origin discrimination claims as being encompassed within the charge and/or reasonably related to same. See Sydnor, 681 F.3d at 595 (the Fourth Circuit has reiterated that the "touchstone for exhaustion is whether plaintiff's administrative and judicial claims are 'reasonably related'"); see also Chacko, 429 F.3d at 512 (holding that the exhaustion inquiry depends not on the broad terms of the boxes on the EEOC charge but instead whether "reasonable investigation of [the plaintiff's] administrative charge would have uncovered the factual allegations set forth in formal litigation"). This is in line with

the Fourth Circuit's instructions to Court to be mindful that "'EEOC charges must be construed with utmost liberality since they are made by those unschooled in the technicalities of formal pleading.'" See Alvarado v. Bd. of Trs. of Montgomery Cmty. Coll., 848 F.2d 457, 460 (4th Cir. 1988)) (internal quotation marks omitted).

Here, Plaintiff's identity as an Indian American is inextricably intertwined with her race as an Indian. Defendant was therefore unquestionably on notice about her discrimination claims based on both race and national origin notwithstanding the formality of checking a box. Accordingly, Plaintiff's race discrimination claim should not be dismissed for failure to exhaust administrative remedies.

**B. The National-Origin & Race Discrimination Claims Present Triable Issues.**

**1. Loganathan may proceed through direct or circumstantial proof.**

Title VII prohibits discrimination because of national origin with respect to compensation and other terms, conditions, or privileges of employment. See 42 U.S.C. § 2000e-2(a)(1).

A plaintiff may prove discrimination through direct evidence or through the McDonnell Douglas[13] framework. See Wannamaker-Amos, 126 F.4th at 255. Under the latter, she shows that she belongs to a protected class, suffered an adverse action, was meeting legitimate expectations, and was acted against under circumstances supporting an inference of discrimination. Although the Defendant articulates a legitimate reason for her termination, the Plaintiff sufficiently shows pretext in light of the strong record of her performance at Ferguson. Id.; see also Sempowich, 19 F.4th at 649–52. As an initial matter, Plaintiff's *prima facie* burden is not onerous.

Nair's alleged statements are direct evidence for the compensation decision because they expressly identify why Loganathan's pay allegedly could not match American peers: she was Indian and on a visa. Loganathan does not claim that immigration status, standing alone, is a protected Title VII category. Cf. Espinoza v. Farah Manufacturing Co., 414 U.S. 86, 95 (1973). She asserts that Nair expressly coupled her immigration status with her Indian origin and used both to explain a pay disparity which is impermissible as a matter of law. A jury could find that "Indian and on a visa" described national origin or race directly or used visa status as its proxy. At

---

[13] See 411 U.S. 792 (1973).

27

minimum, the statements are powerful circumstantial evidence when assessing the later performance-based defenses, particularly because Nair allegedly made them during compensation discussions and remained positioned to influence management. See Wannamaker-Amos, 126 F.4th at 259–60.

That Nair is also from India does not create any legal immunity. The record demonstrates that Nair is from a different state in India and frequently spoke in a different dialect of the Indian language with other peers during work-related meetings so that Plaintiff would not understand what they were discussing.  See Loganathan Decl. ¶ 23. Title VII focuses on whether protected status motivated the challenged action, not whether the actor and employee share a protected characteristic. See, e.g., Dolgaleva v. Virginia Beach City Pub. Schools, 364 Fed. Appx. 820, 827 (4th Cir. 2010) (unpublished) (reversing dismissal of national origin discrimination claim and questioning the district court's assumption that Russia and Belarus are of the same national origin). The shared background is evidence Ferguson may argue to the jury; it does not permit the Court to resolve the direct credibility dispute.

### 2.    Termination, compensation, & changes following the PIP are adverse-actions.

Termination and lower compensation, as Defendant concedes, are paradigmatic adverse actions. Ferguson nevertheless isolates the PIP and argues that a PIP is categorically nonactionable. That is not the claim or the governing standard. See Muldrow v. City of St. Louis, 601 U.S. 346, 350, 354–59 (2024), rejected a heightened "significant harm" requirement for discrimination and requires only some disadvantageous change in an identifiable term or condition of employment. Applying Muldrow, the Fourth Circuit held that loss of supervisory authority and responsibility, even without reduced pay, presents a context-specific jury question. See Herkert v. Bisignano, 151 F.4th 157, 164–66 (4th Cir. 2025).

Here, it is undisputed that once Plaintiff was placed on a PIP, she lost her supervisory authority and responsibility, and instead had to spend significant time accounting for all of her work to Hicks, a task she never had to do before.  See Loganathan Decl. ¶¶ 40, 51-52.  A jury could find some harm here from the combined sequence: reduced teams and managerial responsibility; a changed reporting relationship; a formal disciplinary status carrying an express risk of termination; requirements that diverted substantial work time to recurring reports, diagrams,

trainings, and reviews; placement of expedited I-140 processing on hold pending the performance process; and termination before the stated completion date. Def. Ex. 4 at 177:13–179:7, 233:1–234:13; Def. Ex. 23 at FERGUSON-0000277–83; Def. Ex. 24 at FERGUSON-0000471–72; Loganathan Decl. ¶¶ 28, 29. 38, 62. The cases Ferguson cites concerning an unaccompanied PIP do not authorize the Court to disregard those practical consequences. Even if the PIP alone were insufficient, termination, compensation, reduced responsibilities, and the expedited I-140 hold remain independently or collectively actionable.

**3. Ferguson's own records create a dispute over legitimate expectations.**

Ferguson argues that its criticism conclusively defeats the *prima facie* case. But Sempowich and Wannamaker-Amos reject that shortcut. A plaintiff need not be perfect; she need only produce evidence that she was qualified and meeting legitimate expectations. Sempowich, 19 F.4th at 649–51. Where positive reviews, awards, raises, and the alleged discriminator's criticism conflict, the court cannot simply accept the latter. Wannamaker-Amos, 126 F.4th at 255–56.

The evidence here closely resembles Sempowich. On October 2, Nair rated Loganathan "Effective," describing positive performance and developmental goals rather than failure or imminent discipline. Def. Ex. 19; Def. Ex. 1 ¶ 17. Ferguson awarded a 2.8% merit increase, a separate 14.80% salary adjustment, and a 17.05% bonus against a 15% target. Def. Ex. 15 at P26. Julie Hedly of Ferguson wrote that Loganathan was "performing admirably," had excelled at relationship-building, was proactively seeking feedback, had made significant progress, and was valuable, severely undercutting Defendant's argument that she failed to improve upon being presented with constructive criticism. Def. Ex. 6 at FERGUSON-0000465. Other feedback praised her technical acumen, follow-through, initiative, accountability, and willingness to embrace feedback. Id. at FERGUSON-0000462–65. Ferguson spotlighted her as a people leader and granted a Gold Award on December 5. Pl. Exs. 4–5.

All of these facts require a jury to determine whether her allegedly performance-based termination was pretextual. Ferguson may rely on critical comments, but those comments do not erase its contemporaneous actions to the contrary. Moreover, many feedback entries were designated confidential and not shared with Loganathan, limiting her opportunity to address them. Def. Ex. 6; Def. Ex. 9. Some criticism was submitted only after the late-October complaint. Some

of the same records also contain praise. Moreover, the record reveals that Loganathan sought more details and clarification concerning the criticism she received, but was stonewalled. See Loganathan Decl. ¶¶ 40, 47, 53, 74. On this record, the jury – and not this Court – must decide how to reconcile these competing positions and whether management honestly believed she had suddenly become unable to perform shortly after an Effective review and substantial compensation awards.

**4. The circumstances permit an inference of national-origin discrimination.**

The fourth *prima facie* element may be shown through any circumstances supporting a reasonable inference; a plaintiff is not limited to a single comparator formula. See Sempowich, 19 F.4th at 649; see also Bryant v. Aiken Regional Medical Centers Inc., 333 F.3d 536, 545–46 (4th Cir. 2003). Here, the inference arises from the alleged national-origin compensation statements; the significant disparity with a manager sharing the same title, department, and supervisor; the abrupt movement from Effective rating and substantial awards to an official PIP; the post-complaint collection of additional feedback; Nair's October 29 conclusion that Loganathan was "the wrong person for any role"; and the later hold on immigration processing.

Liang need not be identical for the comparison to have evidentiary value. Loganathan testifies that he held the same Manager–Software Engineering title, worked in the same department, reported to Nair, received the same 15% target bonus, earned approximately $150,000.00, and managed fewer teams and personnel. Loganathan Decl. ¶¶ 24-25. Ferguson identifies experience, geography, function, and external-hire differences. Def. Ex. 1 ¶ 24. Those distinctions may affect weight, but they do not nullify the shared title and supervisor or permit the Court to disregard Nair's alleged express explanation. See Haynes v. Waste Connections, Inc., 922 F.3d 219, 223–25 (4th Cir. 2019).

**5. A jury could find Ferguson's performance explanation pretextual.**

Ferguson's burden to articulate a legitimate reason is one of production, and Loganathan does not dispute that genuine poor performance could justify discipline or termination. The question is whether the proffered reason was honestly held and actually caused the challenged actions. Pretext may be shown by evidence that the explanation was false, inconsistent, based on factual mistakes, unsupported by the employer's own acts, influenced by discriminatory

30

comments, or accompanied by departures from ordinary process. See Sempowich, 19 F.4th at 652–53; Wannamaker-Amos, 126 F.4th at 257–62.

*First*, Ferguson's own conduct contradicts the severity and duration of the performance narrative. It gave an Effective review, merit increase, major additional adjustment, above-target bonus, and recognition during the very period it now calls Loganathan's persistent failure. Sempowich holds that employer words and actions—reviews, awards, raises, and grants—can show that the employer actually believed performance was good and can make later criticism triable. See 19 F.4th at 650–53. As such, this presents a triable issue of fact.

*Second*, a jury could find that management built and escalated a file after Plaintiff's complaints. Nair documented only a "potential PIP" on October 29, declared Loganathan wrong for "any role," and sought additional feedback after her complaint, despite the fact he previously supported her move to an individual role. Def. Ex. 8. UST's October 30 submission says it was provided "as requested;" other feedback arrived October 31 and November 1. Def. Ex. 20 at FERGUSON-0000496–97; Def. Ex. 9 at FERGUSON-0000436–39. Rogers then told the investigator that an unofficial approach became an "official PIP" after "additional feedback." Def. Ex. 12 at FERGUSON-0000485. Wannamaker-Amos recognizes that an effort to build a file from matters not contemporaneously discussed can support pretext. See 126 F.4th at 258.

*Third*, the operative chronology undermines the motion's claim that Loganathan enjoyed more than two (2) months of meaningful improvement time. The PIP was not entered until December 6 or acknowledged until December 9; training, leave, and holidays consumed part of the period; and Ferguson terminated Plaintiff's employment on February 11, before the February 18 end date in the PIP. Def. Ex. 23 at FERGUSON-0000277–83; Loganathan Decl. ¶¶ 48-52, 73. The PIP itself identifies only November 5, November 14, November 19, and November 20 as prior counseling—all after the complaints. Def. Ex. 23 at FERGUSON-0000281. A jury could question whether the nominal November 21 start preceding the December 6 Workday entry, together with the early termination, reflected a genuine opportunity to improve or a process designed to document a predetermined result in light of the intervening events.

*Fourth*, the written communications permit a finding that Loganathan was receptive to constructive criticism rather than resistant. She asked for examples, dates, expectations, and the

source of feedback; stated that she welcomed feedback; committed to improving; acknowledged the plan; and began training. Def. Exs. 21–23, 29. The PIP form itself instructs managers to be specific and give examples, yet it incorporates generalized, unattributed quotations and repeatedly directs Loganathan to "document her steps to improve" without identifying objective success thresholds, which Plaintiff sought but never received clarity on. Def. Ex. 23 at FERGUSON-0000278–82. Treating requests for the specificity Ferguson's own form demands as insubordination is an inference a jury need not accept.

*Fifth*, process evidence supports pretext even if the policies were discretionary. Ferguson's general guide describes constructive discussion, written follow-up, and time to incorporate feedback before escalation. Pl. Exs. 17, 21. Parks received that two-step recommendation; Wandera allegedly received progressive feedback over a longer period. Def. Ex. 11, Supp. Resp. to Interrog. 22. Loganathan does not offer them as identical comparators. She offers them as evidence of how Ferguson ordinarily sought improvement and of the abruptness of her own process. Wannamaker-Amos holds that deviations from disciplinary procedures may be probative even when they do not create an independent contractual right and does not require that such deviations be to exactly similarly situated employees. See 126 F.4th at 260–61.

*Sixth*, Ferguson's investigation record does not eliminate the dispute. The EEO policy calls for prompt, fair, and thorough review. Def. Ex. 2 at FERGUSON-0000113–14. The record reveals no investigation closure date, contains no documented substantive interview of Hicks, and does not show that Loganathan received findings. Def. Ex. 12 at FERGUSON-0000482–88. The investigator told Loganathan on November 22 that a PIP was appropriate because management believed she could improve, yet Ferguson declined to pause a process administered by the individuals she was challenging. Id.; Def. Ex. 29 at P77–81. A jury could find that the investigation accepted management's narrative rather than truly assessing retaliation concerns.

*Seventh*, the stated rationale is not supported by competent, decisionmaker-specific evidence. Nair claims he stopped supervising Loganathan on October 31. Def. Ex. 1 ¶ 10. His declaration does not identify who decided to terminate her, when the decision was made, what PIP deliverables were reviewed, what feedback Hicks provided, or what metric remained deficient. It merely asserts that "Ferguson" saw insufficient improvement. Rule 56 does not permit a

conclusory declaration without demonstrated personal knowledge to erase the underlying disputes. See Fed. R. Civ. P. 56(c)(4).

*Finally*, a jury may consider Nair's alleged national-origin statements and inconsistent descriptions. On October 29, he wrote that Loganathan was the wrong person for "any role in Ferguson"; in the investigation he characterized her as the "right person in the wrong role," and all of this was after he originally supported her transfer to an individual role. Def. Ex. 8; Def. Ex. 12 at FERGUSON-0000486. Such differences, combined with the compensation remarks and positive record, permit an inference that the performance explanation was not the complete or actual reason. The Court need not decide that discrimination occurred. It need only recognize that a rational jury could so find. Accordingly, summary judgment must be denied.

### C. The Discriminatory-Compensation Claim Independently Survives.

The compensation claim does not depend exclusively on Liang. Loganathan's sworn testimony is that the supervisor involved in compensation discussions expressly said her pay could not match American workers because she was Indian and on a visa. Loganathan Decl. ¶¶ 20, 22, 32; Def. Ex. 11, Supp. Resps. to Interrogs. 2, 19–20. Nair denies the statements. Def. Ex. 1 ¶¶ 22–24. A court may not disbelieve one witness because her testimony is "self-serving;" virtually all party testimony serves the party offering it. The question is whether it is based on personal knowledge and is admissible. See Evans v. Techs. Applications & Serv. Co., 80 F.3d 954, 962 (4th Cir. 1996). This testimony meets that standard, and the conflict requires a trial.

If credited, the remarks support liability under both available paths. They are direct or mixed-motive evidence because they explicitly relate national origin to the amount paid. See 42 U.S.C. § 2000e-2(m). They also satisfy McDonnell Douglas by supporting an inference of discrimination and by undermining any neutral explanation. The fact that the promotion salary fell somewhere within a broad range is not dispositive; Title VII prohibits using national origin to choose a point within the range.

Ferguson's records add circumstantial support. The position's Workday range was $7,568.91–$10,408.34–$13,247.76 monthly. Def. Ex. 3 at FERGUSON-0000037. Loganathan's promotion salary, $8,830.62, sat roughly fifteen percent (15%) below the listed midpoint. Ten months later, Ferguson applied a distinct 14.80% "Additional Adjustment" or *ad-hoc* base-salary

change on top of the 2.8% merit increase, bringing her to $10,422.24. Def. Ex. 15 at P26; Def. Ex. 3 at FERGUSON-0000038. A jury could view that unusual double-digit correction as evidence that the initial placement materially understated the role. Ferguson may offer a neutral explanation, but the adjustment does not retroactively establish that the original decision was lawful; it affects duration and damages.

The adjustment also left a significant disparity. Loganathan's resulting annualized base was $125,066.88, while Liang's reported base was approximately $150,000.00. Both allegedly had a 15% target bonus, so the lower base also generated lower target bonus compensation. Loganathan Decl. ¶¶ 24, 26. Ferguson's distinctions are relevant, but comparator analysis is fact-specific. See Haynes, 922 F.3d at 223–25. They cannot resolve the claim as a matter of law in the face of an alleged statement expressly attributing lower pay to Indian origin.

Further, the claim is timely for compensation received within the charge period. The Lilly Ledbetter Fair Pay Act provides that an unlawful compensation practice occurs when a discriminatory compensation decision is adopted, when an employee becomes subject to it, and each time compensation is paid pursuant to it. See 42 U.S.C. § 2000e-5(e)(3)(A). Loganathan filed her charge on March 19, 2025. Paychecks received on or after May 23, 2024—300 days earlier— are therefore independently timely if affected by a discriminatory salary decision. Earlier events remain admissible background, and the statute permits recovery of back pay for up to two (2) years preceding the charge where the unlawful practices during the charge period are similar or related to earlier practices. Id. § 2000e-5(e)(3)(B). Ferguson's argument that the November 2023 decision predates the limitations period therefore does not extinguish the timely paycheck claim.

The Court also should disregard Ferguson's use of a January 2025 settlement demand to impeach Loganathan because the letter did not enumerate the compensation claim. Rule 408(a) of the Federal Rules of Evidence excludes compromise communications offered to prove or disprove the validity or amount of a disputed claim and expressly bars using them to impeach by prior inconsistent statement or contradiction. See Fed. R. Evid. 408(a); see also Fiberglass Insulators, Inc. v. Dupuy, 856 F.2d 652, 654–55 (4th Cir. 1988). The omission is not a sworn contradiction in any event; a settlement demand may emphasize selected issues without cataloguing every legal

34

theory. It cannot justify summary judgment, and the Defendant and their counsel should know better.

### D. The Retaliation Claim Presents Triable Issues of Fact

#### 1. The record permits a finding of protected opposition.

Title VII protects an employee who opposes a practice she reasonably believes violates the statute. See 42 U.S.C. § 2000e-3(a). Opposition need not be formal and need not use technical language; the question is whether the employee communicated opposition to perceived unlawful discrimination and whether the employer understood the communication in context. See Strothers v. City of Laurel, 895 F.3d 317, 335-37 (4th Cir. 2018). The employee need not ultimately prove the underlying practice unlawful if her belief was objectively reasonable. See Boyer-Liberto v. Fontainebleau Corp., 786 F.3d 264, 282–83 (4th Cir. 2015) (*en banc*).

There are at least three (3) protected-activity actions in this record. *First*, Loganathan's verified interrogatory response states that she complained to Nair that she was not paid the same as colleagues and that Nair responded that the difference was due to her national origin and citizenship status. Def. Ex. 11, Supp. Resp. to Interrog. 2. Complaining to the allegedly responsible supervisor about unequal compensation in that context is opposition; a separate HR report is not required. *Second*, her deposition confirms that on October 31 she told Rogers and Nair she believed she was experiencing "potential discrimination and retaliation." Def. Ex. 4 at 178:8–179:7. *Third*, in November she invoked Ferguson's EEO or workplace-concern procedures, described targeted and retaliatory treatment, and requested investigation. Def. Exs. 12, 21–22, 25–26, 29. Any failure by Plaintiff to talismanically invoke the words race or national origin is not dispositive.

Ferguson emphasizes that Loganathan testified she did not report Nair's exact pay statement to a separate official before the PIP and that, when pressed at deposition, she could not identify Nair's subjective motive for the post-September changes. Def. Ex. 4 at 178:14–179:7, 189:18–23. But those admissions only narrow the theory; they do not eliminate it. Opposition is protected when the employee communicates a reasonable belief, not only when she can prove or divine motive. The relevant context included her own unequal-pay complaint to Nair, the alleged national-origin explanation, her use of the terms discrimination and retaliation to the vice

35

president, and Ferguson's opening of an EEO matter. At minimum, what Ferguson understood is disputed. Accordingly, Plaintiff unquestionably engaged in protected activity.

**2. The challenged actions were materially adverse in context.**

Retaliation reaches conduct that might dissuade a reasonable worker from making or supporting a discrimination complaint. See Burlington Northern & Santa Fe Railway Co. v. White, 548 U.S. 53, 68 (2006). The standard covers a wider range of conduct than the discrimination provision and is context-specific. See Herkert, 151 F.4th at 165–66. Ferguson therefore cannot isolate the PIP label and declare it harmless.

A reasonable employee could be deterred by the combined sequence alleged here: reduced teams and authority, changed reporting, a formal PIP expressly threatening discharge, use of previously unshared criticism, a hold on expedited I-140 processing, intensive collateral requirements, and termination before the PIP end date. For an employee whose continued authorization and permanent-residence process depended on employer sponsorship, tying I-140 progress to a contested disciplinary process is particularly consequential. Def. Ex. 24 at FERGUSON-0000471–72. Termination is independently materially adverse, so even if the Court found one intermediate act insufficient in isolation, the retaliation claim remains viable based on the plethora of adverse employment actions present here. Perhaps the most critical form of adverse employment action undertaken by Ferguson was to place her citizenship sponsorship on hold despite the fact she remained employed there; Defendant fails to identify any authority for the proposition that they were required to do so in light of any alleged uncertainty concerning her continued employment there. Moreover, the decision to place her sponsorship on hold renders her termination a *fait accompli*, and eliminates any notion that Plaintiff was given more than two (2) months to improve when the record demonstrates significant improvement in light of her merit-based raises, bonuses, and awards.

**3. Knowledge, timing, and intervening conduct permit a causal inference.**

A *prima facie* causal showing requires evidence from which a jury may infer that the protected activity and adverse action were linked. See Foster v. University of Maryland–Eastern Shore, 787 F.3d 243, 250 (4th Cir. 2015). Rogers, Nair, Hicks, and HR had knowledge of the complaints during the challenged process. Hicks's November 5 notes acknowledge that

36

Loganathan reported workplace harassment and targeted treatment and that HR would contact her. Def. Ex. 21. The investigation record identifies Nair as accused, Loganathan as target, and Rogers as manager. Def. Ex. 12 at FERGUSON-0000482.

The timing is not limited to the February discharge. The October 28 and October 31 reports converged with a still-potential PIP; Nair sought additional feedback on October 29; additional submissions followed from October 30 through November 1; Hicks became supervisor November 1; the I-140 hold followed November 12; the official PIP followed later in November and was entered December 6. That uninterrupted sequence supports causation. See Lettieri v. Equant Inc., 478 F.3d 640, 650–51 (4th Cir. 2007) (intervening retaliatory conduct may establish causation despite a longer gap to termination).

Ferguson invokes cases holding that an employer may continue a disciplinary course already fixed before protected conduct. See Clark County School District v. Breeden, 532 U.S. 268, 272 (2001). But the record here does not establish an irrevocable pre-complaint decision. Nair describes only discussion of a "potential PIP." Def. Ex. 1 ¶ 18. Rogers says the official PIP came after additional feedback. Def. Ex. 12 at FERGUSON-0000485. The document itself was not entered until December. Def. Ex. 23 at FERGUSON-0000277. A jury may find that protected opposition preceded material steps in creation, approval, administration, immigration consequences, and termination.

**4. The same record permits a finding of but-for retaliatory pretext.**

At the ultimate stage, Loganathan must show that retaliation was a but-for cause of the adverse action. See University of Texas Southwestern Medical Center v. Nassar, 570 U.S. 338, 362 (2013). Foster holds that this requirement operates within McDonnell Douglas: evidence that the employer's nonretaliatory reason is pretextual may permit a finding of but-for causation. See 787 F.3d at 249–52.

The pretext evidence is cumulative and mutually reinforcing: an Effective review and substantial awards; an alleged national-origin pay explanation; a potential rather than final pre-complaint PIP; additional feedback requested and obtained after the complaint; no documented pre-November counseling in the PIP; a nominal start date preceding the Workday entry; requests for specificity recast as resistance; a Gold Award during the process; the I-140 hold; the incomplete

investigation record; termination before the stated end date; and a termination rationale supplied by a former supervisor without identified personal knowledge of the final decision. A jury could find that Ferguson used performance as an after-the-fact legitimate explanation, or it could find that the process was escalated and administered to remove an employee who had complained. Rule 56 does not allow the Court to choose between those accounts; only a jury may decide that factual dispute.

Ferguson's assertion that the HR matter closed three months before termination is itself disputed. The produced form has no completed "Date Closed," the entries continue into December, and Loganathan states that she received no status or outcome. Def. Ex. 12 at FERGUSON-0000482–88; Loganathan Decl. ¶¶ 29–30, 50–53. Nor does Loganathan's January 29 acceptance of an HTC offer negate causation. Ferguson did not know of that offer when it terminated her, Loganathan Decl. ¶ 58, so it could not have motivated the decision. The offer concerns mitigation and damages, not whether Ferguson retaliated.

**E. The Parallel Virginia Human Rights Act Claims Must Survive.**

The VHRA makes it unlawful for an employer to discharge or otherwise discriminate with respect to compensation, terms, conditions, or privileges because of race or ethnic or national origin; prohibits use of a protected characteristic as a motivating factor even when other factors also motivate the practice; and prohibits discrimination against an employee because she opposed a practice made unlawful by the chapter. See Va. Code § 2.2-3905(B)(1), (6), (7). Ferguson's reliance on the separate general whistleblower statute, Va. Code § 40.1-27.3, does not define Count II, which pleads the VHRA.

Ferguson analyzes the VHRA claims under the same basic evidentiary framework as Title VII. The same disputed record therefore defeats summary judgment: direct and circumstantial evidence concerning compensation; actionable termination and disadvantageous changes; evidence that Loganathan was meeting expectations; protected opposition and employer knowledge; close and continuous timing; and extensive pretext evidence. Because the VHRA expressly recognizes motivating-factor discrimination, the evidence is independently sufficient even if Ferguson persuades a jury that performance also played a role. Summary judgment should be denied on Count II for the same reasons as Count I.

## CONCLUSION

Accordingly, Defendant's motion for summary judgment should be denied.

RESPECTFULLY SUBMITTED on this 31st day of July, 2026.

**SAGE LEGAL LLC**

*/s/ Emanuel Kataev, Esq.*
Emanuel Kataev, Esq., NY Bar # 5154588
*Admitted pro hac vice*
18211 Jamaica Avenue
Jamaica, NY 11423-2327
(718) 412-2421 (office)
(917) 807-7819 (cellular)
(718) 489-4155 (facsimile)
emanuel@sagelegal.nyc

*Attorneys for Plaintiff*
*Manimegalai Loganathan*

39